Prentice Jackson, white man, lived in Piney Grove Township, Sampson County, North Carolina, about two and a half miles from defendant, a Negro man. On 29 June, 1932, about 10 o'clock at night, the prosecuting witness describes what occurred as follows: "Had a tub of water drawn, put it in the kitchen, shut the door and sat down to take a bath, while my wife was fixing the bed. I was washing this leg, and heard something click like a gun, and I looked in the window and saw a double barrel shot gun, and I aimed to holler or run. I looked and saw Charlie McLamb, and he had a gun ready to shoot and I hollered, but don't know anything else. I knew Charlie McLamb and saw him. It was he that shot me, and that is the truth. . . . When I looked at the window, he had the gun ready to shoot, and I didn't have time to do anything, or even say a word. There are four panes of glass to the sash, four below and four above. He shot me through the right-hand pane from me, and through his left-hand pane. It was about ten and one-half feet from where I was sitting to the window. I didn't have time to do anything, and after the gun fired, I didn't know anything. . . . I do not know how many shot hit me, forty-eight shot could be found in the house. I have two on each side of my hair, some on my shoulder and some went through here, and some in my nose and part of them buried in my skull. At that time I lost one eye on the count of the shooting. I went to two hospitals and stayed about a week. The gun shot that went through my neck, affected my voice, and it strains me to talk. I am talking as loud as I can. I am partly deaf in this ear, so many shot in here that I cannot open my mouth but half as much as I used to. I cannot eat my food, except a little crumb at the time."
On 3 April, 1932, Jackson had trouble with defendant. Jackson with his brother was going to Faison for a doctor. As they got into the Faison and Clinton road, Jackson's brother was making a curve and a car driven by defendant dashed by and if it had run into Jackson and his brother it would most likely have killed them, as indicated by the evidence. The car driven by defendant after it passed "was zig-zagging across the road." "After we got by Mr. Ross Ireland's he (defendant) stopped and got out, he had a crank in his hand. There was another fellow that he had met up with. He motioned us to stop, and we stopped and Charlie McLamb wanted to know what in the God dam hell we blowed on him for. I said `We wanted to go and get some medicine for a sick baby.' He said `Its a God dam lie,' if you wanted to go by you could get by.' I said `No, we could not have gone by when you did not get out of the road.' He said, `You s. o. b. that aint so.' When he called me that I stepped out of the car and said `Who are you cursing,' and he said `Where is my God damn hammer,' and he reached in the car and *Page 445 
got the hammer, and my brother stepped out, and he then said `Where is my God dam gun.' He got his gun and the other fellows were scared and he tried to get the other fellow to come and beat hell out of us. We could not do anything, and I got into the car and Charlie kicked my brother and started to pull my brother out of the car, and I said `Don't you pull him out of the car,' and he said `I want to kill you anyhow — I will get you.' I went to Mr. Sam Howard's, the police at Faison, and indicted him Monday morning. His trial was put off until 5 July, and I was shot on 29 June."
S. K. Bradshaw lived about 100 yards from Prentice Jackson who lived on his place, and went to his house that night after the shooting. He testified, in part: "We picked him up and put him on the bed. Prentice said `Mr. June, I am shot, I know who did it.' He died away, and when he came to he said `Charlie McLamb.' I went after a trained nurse. He said `I saw him through that window, I saw his gold teeth." He seemed to be in his right mind for a few minutes, and then would faint away. Later on in the night when Prentice revived he said that McLamb shot him, and to tell his father to go get him. . . . I could tell where Prentice Jackson was sitting by the sign of the blood and by the chair in the door. Prentice Jackson has shown me once, and you could tell by the signs of blood where he was sitting. The tub was down there when he was washing. The lamp on the table was burning when I got there. It was pulled out from the side of the room so it gave light to see him bathe. It threw light as far beyond the window as here to the courthouse door. Q. Have you, since the shooting, sat with the lamp on the table or dresser where it was, and knew where Prentice Jackson said he was sitting, and did anybody come up to that window to see whether or not you could identify them, and if so, what time of day or night was it? Answer: Night time, after dark. . . . Q. Relate to the jury, whether or not you could tell a man coming up to the window? Answer: Yes, sir, you could tell a man. I had several to go up to the window. They had a gun. Dave Oats and my little boy, and you could tell who he was. He had a gun, but was not tall enough for you to look like you ought to. Q. Did you try it with a colored person? Answer: Yes, sir, had a colored person at window. You could tell better through the window pane than the one that was shot out. Seems that the glass reflected upon the gun and upon the person." The defendant excepted and assigned error as to the evidence. There are several exceptions and assignments of error as to this kind of evidence introduced on the part of the State.
The witness testified further: "I examined Mr. Jackson that night to see how he was shot up. I didn't count the shot then, but there were, *Page 446 
when the doctor counted, thirty some odd shot, and they were number four shot. His eye was shot out, and the sight of his eye was running out, and he was bleeding mighty bad all over."
This testimony was corroborated by several witnesses who went to Jackson's house shortly after the shooting.
Sheriff W. H. Moore, testified, in part, that he went to defendant's home that night. "I found Charlie McLamb in the house. I found his shoes, they had sand sticking around the soles, as if they had been worn out in the dew. The next morning I went back there for further examination. I looked around the place to see what I could find. Back of Prentice Jackson's house, in a squash patch, behind the squash bush, I found the print of two knees, and the print of the gun stock where it had stood between the knees. I went to Charlie McLamb's and got the gun and looked at the end of it, and it had grass stains on the end of the stock where it had been sitting on the ground, and there were grit sticking on the end of the stock. I took the gun to Prentice Jackson's where the imprint of the gun was between the two knees, and it was exactly the same print. Q. Did you examine the grit on the gun stock with the grit on the ground as you found there? Answer: Yes, sir, I was careful not to knock that sand off until I got back there. The grit on the gun compared with the sand of the ground at the squash bush."
Prentice Jackson was corroborated by Sheriff Moore as to his telling him how he was shot and by the defendant. The defendant did not go upon the stand, but set up an alibi that at the time that it is alleged that Prentice Jackson was shot that he, the defendant, was in Faison. Charlie McLamb lives some 8 or 9 miles west of Faison. Mr. Jackson lives 9 miles west of Faison.
In rebuttal the evidence on the part of the State, Ben Cooper testified, in part: "I live at Faison and run a barbecue stand and fish market. I know Charlie McLamb. On the night of 29 June, I saw Charlie McLamb. I was taking in my stuff from the outside, when Charlie McLamb came by headed out of town in the direction that Prentice Jackson lives; I looked up at the train come in, I figured it was 8:30 or 8:35."
Roscoe Cooper testified, in part: "I live in Faison, and am the son of B.R. Cooper, and was working with him on the night of 29 June. I saw Charlie McLamb that night. He was going along the road that leads out of the town towards where Prentice Jackson lives. He could have turned to the right, and gone home, or he could have turned to the left. It was about 9:00 o'clock. I cannot say how many were with him."
Arnold Vann testified, in part: "I live about three-fourths mile from town of Faison, and know Charlie McLamb and know his automobile *Page 447 
when I see it. I was coming from Faison about 8:40 and just as I turned into the yard to go to my house, Charlie's Ford passed, and I walked to the back door. The train came, and it was about 8:40. I know where Prentice Jackson lives. Charlie was going toward Prentice Jackson's house at the time he passed me."
The bill of indictment charges: (1) defendant unlawfully, wilfully, maliciously and feloniously, and in a secret manner did assault, beat and wound one Prentice Jackson with a deadly weapon, a shot gun, with felonious intent to kill, inflicting serious injuries; (2) and assault with a deadly weapon, a shot gun, with intent to kill. The two counts are in the usual legal form.
The verdict of the jury was as follows: "Do say upon oath that the said Charlie McLamb is guilty of an assault with a deadly weapon with intent to kill in a secret manner, one Prentice Jackson."
The judgment of the court below was as follows: "It is therefore considered by the court that the said Charlie McLamb shall be confined, on the first count in the State's prison at hard labor for a period of five years." On 17 August, 1932, during the term of the court, "upon request of the State, the case was reopened. To the reopening of the case the defendant objected. Objection overruled, defendant excepted. Sentence was increased by the court from five to six and a half years. To this increase of sentence, the defendant objected. Objection overruled. Defendant excepted."
The defendant made numerous exceptions and assignments of error among them those above set forth, and appealed to the Supreme Court. We will only consider the material ones.
The defendant, at the close of the State's evidence and at the close of all the evidence moved to dismiss the action or for judgment of nonsuit. C. S., 4643. The court below denied the motions, and in this we can see no error.
C. S., 4213, is as follows: "If any person shall in a secret manner maliciously commit an assault and battery with any deadly weapon upon another by waylaying or otherwise, with intent to kill such other person, notwithstanding the person so assaulted may have been conscious of the presence of his adversary, he shall be guilty of a felony and shall be punished by imprisonment in jail or in the penitentiary for not less *Page 448 
than twelve months nor more than twenty years, or by a fine not exceeding two thousand dollars, or both, in the discretion of the court."
In S. v. Bridges, 178 N.C. at p. 738, we find: "The defendants were waiting in the dark for him, as much concealed as if they had been hidden in ambush, prepared to slay without a moment's warning to their victim, who was thus unexpectedly confronted by this hitherto unseen peril. J. W. Cole describes the situation in such way as to show conclusively, if his testimony was truthful, that he was so surprised that he was instantly rendered helpless because he did not know of the presence of the defendants behind the house, as they were hidden by the darkness. As was said, `they loomed up before him' with a suddenness of an apparition; and he first saw them when the gun flashed."
In S. v. Kline, 190 N.C. at p. 178-9, is the following: "It appears that on the night of 22 April, 1925, the prosecuting witness, Truby Proctor, was visiting at the home of J. F. Wicker, near Colon in Lee County. While there some one secreted himself in the rear of his automobile. The prosecuting witness left about 10:00 o'clock and was driving towards the public highway from the Wicker house, when the person in the rear of the car struck him over the head with an iron bar, inflicting serious injury upon him. Proctor testified that in the scuffle which followed, partly in the light of the automobile, he recognized the defendant as his assailant; that the defendant left the car, ran down the road, across the field and towards the woods. The defendant testified that he was at the home of Mr. R. S. Kelly on the night in question; that he roomed there; that he knew nothing of the occurrence until about 1:00 or 1:30 o'clock that night when he was aroused from his bed and charged with the offense. The evidence was plenary on both sides. It was sufficient on behalf of the State to warrant a conviction and on behalf of the defendant to warrant an acquittal." The evidence in both of the above cases was held sufficient to be submitted to the jury as to a secret assault. S. v.Oxendine, 187 N.C. 658.
The defendant contends that as a defense he set up an alibi. To corroborate the prosecuting witness Jackson, who testified that he recognized the defendant, that certain evidence offered by the State was prejudicial as the evidence did not show similarity of the conditions. These exceptions and assignments of error cannot be sustained.
Speaking to the subject, we find the following in 22 C. J., p. 755, sec. 842(1): "The conditions of a relevant occurrence may be artificially created in an experiment, and where the material facts bearing on the particular issue are precisely duplicated in the experiment, the result may be received in evidence. Such evidence is appropriate where the question to be determined relates to such matters as whether an object in a *Page 449 
certain position can be seen from a given height above a designated spot, or from a given distance," etc. Section 843 (3) at p. 756: "Whether or not evidence of experiments is admissible is, under the circumstances of each case, a preliminary question for the determination of the court, in the exercise of its discretion, which will not be interfered with by an appellate tribunal unless an abuse is made clearly to appear." Blue v. R.R., 117 N.C. 644; Cox v. R. R., 126 N.C. 103.
In Conrad v. Shuford, 174 N.C. at p. 722, in reference to similarity in essential conditions, quoting from 17 Cyc., at p. 285, it is said: "Evidence of other facts or occurrences is then admitted, provided the court deems this course a wise exercise of its administrative discretion. The probative fact or occurrence may be (1) found in actual life by observation, or (2) reproduced voluntarily in an experiment. A sufficient ground of admissibility is furnished where physical conditions are shown to have been identical on the two occasions."
The defendant contends that the court below admitted a question "which called for a conclusion from the witness rather than the witness stating facts from which the jury could draw its own conclusions. This is clearly an erroneous method of questioning witnesses and is an intrusion into the duty of the jury." We can see no prejudicial error, if error at all, in the question and answer.
Nor do we think the exclusion of certain hearsay evidence can be sustained in an attempt to fix the time that defendant was in Owens' store by John Avery Cox: "I went to Mr. Owens' store twice that night, the first time about ten o'clock to get a drink. I saw Mr. Lee Stevens, Jesse Ashford and Charlie (McLamb, defendant). Mr. Precise's son was clerking in the store, and he waited on me. Mr. Jackson lives on another road from Charlie. Q. Was there anything said, and if so, what, between Charlie McLamb and Ralph Precise about what time they were going to close the store? (If permitted to answer, the witness would have said, Mr. Precise asked him about selling him some fish, and Charlie said he was not ready to go home, and Charlie asked what time it was then, and Mr. Precise said it was twenty minutes to ten o'clock)." The defendant thereafter had Ralph Precise to testify, and the time fixed by him "It was around ten o'clock."
We do not think the objections of defendant to the charge can be sustained, taking it as a whole and not disconnectedly. The court below, in the beginning of the charge, read the bill of indictment in which it set forth fully all the ingredients of a secret assault.
In S. v. Kline, supra, at p. 178, the principle is set forth as follows: "The statute under which defendant was indicted and convicted provides that if any person shall commit an assault and battery upon another (1) *Page 450 
maliciously, (2) with a deadly weapon, (3) in a secret manner, and by waylaying or otherwise, notwithstanding the person so assaulted may have been conscious of the presence of his adversary, (4) with intent to kill such other person, he shall be guilty of a felony and shall be punishable by imprisonment in jail or in the penitentiary (State's prison) for not less than twelve months nor more than twenty years, or by a fine of not exceeding two thousand dollars, or both, in the discretion of the court. C. S., 4213. In order to warrant a conviction under the statute, all of the essential elements of the crime must be proved by competent evidence (S. v.Crisp, 188 N.C. 800), and the burden is on the State to establish the defendant's guilt beyond a reasonable doubt, where a plea of `not guilty' is entered, as was done in the instant case. S. v. Redditt, 189 N.C. 176;Speas v. Bank, 188 N.C. p. 527." The evidence on the part of the State was plenary.
The court below accurately defined reasonable doubt, and charged the jury: "If the State has satisfied you beyond a reasonable doubt, it would be your duty to convict the defendant. If it has not so satisfied you, it would be your duty to acquit him."
The court fully instructed the jury as to the alibi set up by the defendant, and further charged: "As to the first count, you will remember that I read the count and read the words `wilfully and feloniously and in a secret manner.' The State contends that the crime was done wilfully and maliciously and that he went up there with malice in his heart against Mr. Jackson and shot him with a shot gun and that it was done in a secret manner, and that Mr. Jackson was bathing, preparing to go to bed and take his night's rest and that McLamb shot him, inflicting serious injury upon him."
On the aspect of secret assault, the defendant did not ask for fuller or more specific instructions.
In S. v. O'Neal, 187 N.C. at p. 24, the following is set forth: "The statute, it is true, requires the judge plainly and correctly to state the evidence and to declare and explain the law arising thereon (C. S., 564), and this requirement has been construed as implying that on all the substantial features of a case a correct charge must be given without regard to a special prayer, but as subordinate features or particular phases of the evidence a litigant who desires special explanation should make proper request for appropriate instructions."
Although we have considered the material exceptions and assignments of error to the charge of the court below made by defendant yet nowhere are they set forth in the body of the charge as "continuity of the charge is necessary with the `specific' exceptions." Rawls v. Lupton, 193 N.C. at p. 432. *Page 451 
The defendant further complains of the court below changing the punishment. In S. v. Crook, 115 N.C. at p. 764, we find: "The judgments, orders and decrees of a court as a general rule are under its control and subject to modification during the term at which they are entered; but where a defendant had undergone a part of the punishment, the sentence cannot be revoked and another, except in diminution or mitigation, substituted for it, because he would be twice placed in jeopardy and twice subjected to punishment for the same offense. S. v. Warren, 92 N.C. 825;Ex parte Lange, 18 Wall., 173."
It is well settled in this jurisdiction that the court below, in its sound discretion can, during the term, as said in S. v. Warren, 92 N.C. at p. 827, "correct, modify or recall an unexecuted judgment in a criminal, as well as in a civil case." This cannot be done when the defendant has undergone a portion, though an inconsiderable part, of his sentence.Warren's case, supra.
We think under the facts and circumstances of this case, that the defendant had not undergone a part of the punishment. He had given notice of appeal, he was still in jail, it was during the term of court in which he was tried, and we think the whole matter remained in fieri. The punishment of defendant was the responsibility of the court below. Succinctly the defendant with malice, in a secret manner at the prosecuting witness' home, in the night time, without provocation, assaulted and maimed him by shooting out one of his eyes. The final judgment of the court below was six and a half years. Under the law the court below could have sentenced defendant to twenty years imprisonment and fined him $2,000. From the record, we find in law
No error.