The STATE OF MONTANA, Plaintiff and Respondent, *v.*
THOMAS BLAIR, Defendant and Appellant.

No. 10951.

Submitted October 20, 1965. Decided January 26, 1966.

410 P.2d 450.

Mr. Justice John C. Harrison, dissented.

F. F. Haynes, Forsyth, Clayton Jones, Jr., Miles City, Charles F. Moses (argued), Billings, Dale Morman (argued), Sturgis, S. D., for appellant.

Forrest H. Anderson, Helena, William G. Sternhagen (argued), Helena, Gene Huntley (argued), Baker, for respondent.

MR. CHIEF JUSTICE JAMES T. HARRISON delivered the Opinion of the Court.

Appeal by defendant Thomas Blair from the District Court of the Sixteenth Judicial District, wherein he was convicted of the crime of assault in the first degree with intent to commit a felony upon the person of a human being, to wit: Bud Moulette, by shooting and injuring him with a shotgun.

The testimony given by the defendant and the complaining witness, Moulette, conflicts at nearly every point. A resume of the occurrence follows:

The stage is set in the Chalk Buttes country of southeastern Montana between Broadus and Ekalaka.

About 9:00 o'clock on a Sunday morning, November 24, 1963, we find the defendant Blair suffering from a gallstone attack and vomiting upon the ground next to his pickup truck just east of his barnyard. Blair is 52 years old, stands 5 feet 10 inches tall and weighs about 160 pounds. Mrs. Blair is sitting in the cab of the truck.

Enter Bud Moulette from the northwest, unarmed and wearing chaps, riding toward the barnyard on a horse which he stated had been broken but three days before. Moulette weighs 180 and stands 6 feet tall. He is in good physical condition at the age of 45 years. Little if any friendship has passed between the two men during the 14 year period they have been neighbors.

As the scene opens, Moulette, who had dismounted in order to open a wire gate in the northwest corner of the barnyard, is leading his horse across the barnyard toward Mr. and Mrs. Blair, unsnapping his chaps as he walks. The two ranchers face

each other across a wooden gate in the northeast corner of the barnyard, Blair on the outside, Moulette on the inside. A struggle of considerable proportions begins at this point, during which Moulette vaults the wooden gate in pursuit of Blair. The two men struggle by the pickup truck over possession of a rifle taken from the truck. Mrs. Blair eventually takes the rifle away from the men as Blair bolts for the house on the south side of the barnyard. Moulette pursues Blair into the barnyard and there continues to struggle with him, administering a goodly quantity of abuse. Moulette is by far the superior contestant in this struggle and has little difficulty delivering several punches and shoves to Blair's face and body before the older man is able to escape his assailant and dash into his house, only to reappear in a moment with a shotgun in hand. Home suddenly appears the logical place for Moulette and he hastens thither forthwith, leaving his horse and batwing chaps behind. Blair delivers a charge in Moulette's direction. Two pellets are before this court which allegedly found their mark in the body of Moulette.

At the trial, the defendant offered into evidence Exhibits Nos. 4 and 5, objections to which were sustained, and the exhibits refused. Each exhibit consisted of overalls tacked to three-quarter inch planks. These exhibits had been taken to a target range and fired upon—exhibit 4 at a distance of 85 feet three inches; exhibit 5 at a distance of 233 feet. The same shotgun and ammunition from the same box of shells were used in this test as were used by Blair on November 24, 1963, in his encounter with Moulette. The results of the test dramatically show the pattern and striking force of No. 2 chill, 12 gauge shot at the two distances. At the closer distance, more than 120 pellets struck a three-foot area with sufficient force to pierce both sides of the blue jeans and then penetrate the board backstop nearly one-half an inch. At the greater distance, less than 20 pellets struck the target, none of which had sufficient force to pierce the blue jeans, although indentations are found

behind the overalls which indicate where a few of the pellets struck.

The distances of 85.3 feet and 233 feet were used by reason of the testimony given by Moulette and Blair. Moulette claims that his horse was never tied to the wooden gate at the east corner of the barnyard, and that it had wandered back to the northwest gate through which Moulette had first entered the yard. After Blair escaped and ran into his house, Moulette had difficulty controlling his skittish horse, broken but three days before. When Moulette saw Blair running out of his house with a gun, Moulette says he vaulted the wire gate and ran in a zig-zag fashion for some nearby trees. Moulette claims Blair fired upon him when he reached the east fence of the barnyard, just as Moulette had found shelter behind a tree. The distance from the fence to the tree was 85.3 feet.

Blair's version of the shooting varies from Moulette's substantially. He claims that when he ran out of the house, Moulette had just finished untying his horse at the wooden gate and was leading him across the barnyard toward the northwest gate. Blair has an injured knee and he claims that as he ran from the house with the gun that his knee gave way and caused him to collapse. Blair states that Moulette did not see him sitting in the barnyard until he reached the northwest wire gate, and that then he dropped the rains of his horse and ran through the gate and westward down the road, seeking the cover of some bushes. Blair claims he remained seated and that after Moulette went out of sight behind the bushes, he fired a shot in that general direction because "he (Moulette) was scared and I thought it was a pretty good idea to keep him that way." The distance between the men in this version of the shooting was 233 feet.

On direct examination, Moulette testified as follows:

"A. I dug out two shots. One in my hip and one in my leg.

"Q. What hip? A. Left hip. * * *

"Q. Just about at the belt line or slightly above it? A. Slightly above it.

"Q. Where was the shot in the leg? A. Right in here. I was running at the time and my leg was up here.

"Q. You are showing the inside of your leg between your hip and your knee? A. Yes, sir.

"Q. You say you dug out some shots? A. Yes, sir.

"Q. How did you dig them out? A. With the point of my knife.

"Q. Were they in very deep? A. No, sir.

"Q. Did they cause any extensive bleeding when you dug them out? A. No, sir."

The complaining witness then produced the two shots he had removed, these being admitted as Plaintiff's Exhibit B.

The defendant's Exhibits Nos. 4 and 5 were offered to demonstrate the striking force of No. 2 chill shot at the distances mentioned in each man's version of the shooting. The exhibits were not admitted "because of the dissimilarity of the conditions under which the offer is made and to the testimony as to the actual shooting by the defendant."

The defendant claims he fired through some bushes toward a man he could not then see. The judge must have considered these bushes when ruling that the conditions were not similar at the time of the test firing. Yet one of the pellets Moulette claims to have dug out of his skin shows no scratches or marks indicating that it struck branches or twigs before striking Moulette. It is absolutely round. Pellets removed from both defendant's Exhibits 4 and 5 show considerable deformation. If this pellet flew directly to Moulette and encountered nothing before striking him, it would have caused a far more serious wound at 85.3 feet than it would have at 233 feet. The defendant's exhibits would have demonstrated this fact and would have aided the jury in its search for the truth.

Further, according to Moulette's own testimony, there were no bushes or objects between Blair and himself at the time of the shooting save for the tree behind which Moulette claims he sought shelter. The pellet shows no sign of having struck or glanced off of any object as hard as a tree. In addition, when

Moulette finally, eighteen days later, went to a doctor, the doctor was unable to tell how the marks on his skin had been caused. X-ray pictures showed no other pellets in his body. He received as treatment a tetanus shot.

The jury was entitled to consider these facts the better to test the veracity of the parties involved.

As to Moulette's version of the shooting, the defendant's exhibits would tend to show that the occurrence could not have happened in the manner alleged. Experimental evidence is alway admissible for that purpose if conducted under conditions approximating those of the actual occurrence.

In 2 Wharton's Criminal Evidence, pp. 636-637, § 682, it is stated: "It is not necessary that the conditions under which the experiment was conducted be identical with the conditions which existed at the time of the crime, but the existence of any variations is to be considered by the jury in determining the weight of the evidence of the experiment."

Therefore, the bushes which were between Blair and Moulette according to Blair's story, and relating to Exhibit 5, do not affect the admissibility of that exhibit, considering the unmarked condition of at least one of the pellets, and runs only to the weight of that evidence.

It must be remembered that the same gun Blair used on Moulette was used in this test firing and that shells from the same box of ammunition were fired against the targets. A different ruling would undoubtedly be correct if different weapons had been used, or if different ammunition or chill loads had been used in the experiment.

Furthermore, no experts were used to prepare these exhibits. At noon on the day they were later offered Leland Smith, Charles Elmore, two Johnson boys and Blair's son-in-law, Richard Peterson, went out to the rifle range in company with Blair. The exhibits were set up, distances measured, and Leland Smith fired the shotgun at the request and under directions from Blair. We are not here concerned with whether experts are required to explain these exhibits. They demon-

strate striking force. They are self-evident of such force. No ballistics or other highly technical knowledge or skill is required to explain these exhibits. Tests with shotguns to show shot patterns are generally admissible. See 20 Am.Jur. §§ 755-762. Modern Scientific Evidence § 17.14.

It is true that the admissibility of such experimental evidence as concerned here is largely within the discretion of the trial court.

In State v. Vuckovich, 61 Mont. 480, 494, 203 P. 491, certain experiments were conducted with reference to pistol shells and objection was made to the introduction of the evidence, in particular as to the experiments made. This court stated: "It seems to be a well-established rule that it is largely within the discretion of the trial court to permit experiments to be made, and that caution should be exercised in receiving such evidence. It should be admitted only where it is obvious to the court from the nature of the experiments that the jury will be enlightened, rather than confused."

In State v. Keller, 126 Mont. 142, 148, 246 P.2d 817, 820, we reaffirmed the principle that admission of experimental evidence is one addressed to the trial court, but it was further stated: "Substantial similarity of conditions is all that is necessary to render such evidence admissible. 20 Am.Jur., Evidence, § 756, p. 628. 'Whether the circumstances and conditions are sufficiently similar to render the results of the experiment competent is of course a preliminary question for the court, and unless too wide of the mark, the ruling thereon will be upheld on appeal.' State v. Phillips, 228 N.C. 595, 46 S.E.2d 720, 722."

This court feels, however, that due to the several conflicting versions of the shooting, and the fact that the truthfulness of the witnesses in the eyes of the jury is of such great importance here that any evidence or exhibits which would aid the jury in its determination which are within the realm of proper admittance should have been made available for the jury's consideration.

There are many other specifications of error, but we do not

deem it necessary to discuss each one since many of them have no merit, but we shall consider the argument of the defendant that the evidence was insufficient to convict him of assault.

We have heretofore discussed the physical aspects of this encounter, now we wish to discuss other portions of the background as concern the purposes, intent and actions of the complaining witness, Moulette, an Army paratrooper in World War II with several years training in hand-to-hand combat.

Taking his own testimony solely, he stated that about three weeks before November 24, 1963, he built a lane to a community corral, about three days later he noticed three posts were missing and the woven wire he had installed was down. He did nothing about it at that time. On the morning of November 24, 1963, he was riding on cattle and saw two Holstein yearling heifers in his pasture. At that time he decided to go to Blairs because, as he explains it, he did not know who they belonged to.

As he approached the Blair place he observed the defendant in front of his truck, in a short space of time he observed Mrs. Blair leaving her home and she passed him headed toward the garage and truck; no greetings were exchange by him or Mrs. Blair, who he described as walking very fast. He further testified since she had been very friendly, when she did not speak to him, "I sensed there was something definitely wrong." He then unsnapped one buckle of his chaps because he was afraid, he knew Mr. Blair to be violent, unpredictable. When asked: "What happened, if anything?" He replied: "Well, I thought of a gun, I knew it was the only thing to do." Up to this point not a word had been spoken. Then he observed Blair come out from behind the truck, Mrs. Blair following, Moulette was walking towards the wooden gate and he waited for them to approach. The conversation opened between him and Blair when Blair was about five steps from the gate and Mrs. Blair about five steps behind her husband. Moulette spoke first, he asked Blair if they were his Holsteins in his (Moulette's) pas-

ture. Blair responded no, that he thought they were Moulette's. Moulette then asked Blair if he had put them in there and Blair responded that he had not. Moulette then asked Blair why he was tearing down the community corral, and then according to Moulette, Blair ran for the truck, which was around 15 steps away. It was then that Moulette jumped over the wooden gate and pursued Blair to the truck.

On cross-examination Moulette admitted that because the posts were missing from the corral he decided that Blair had taken them, although he did not see him do it. He saw the brand on the Holstein cattle and did not think it was Blair's brand, unless Blair had secured a new one. Moulette, the next day, put these cattle back into another neighbor's property. Further, he admitted he could have ridden on horseback directly to the truck, but he chose to go through two gates, which then positioned him between Blair and Blair's own home.

Immediately following the encounter, Blair went to Ekalaka, the county seat, and informed the sheriff of the matter. He was seeking a complaint against Moulette for assaulting him. Later on that same day a conference was had at which both complaining witness and defendant were present. The sheriff testified that at that conference there were no complaints made by Moulette that he had been hit.

The encounter occurred on November 24, 1963. At some time thereafter, Moulette hired an attorney as special assistant to the county attorney at his own expense. The information was filed on April 8, 1964, four and one-half months after the encounter.

From this record it clearly appears that a hostile, bold, and strong trespasser intruded himself upon defendant's property, not content to approach as would any ordinary person by way of the road, but opening two gates while traveling on horseback so as to position himself between the man he had come to confront and the latter's home. Upon his very entry into the premises he senses something is wrong, and then his thoughts

run to a gun. He states his intentions were to secure information, but from his own lips also he was concerned about a corral and a couple of Holstein cattle that were in his field. His statements to the defendant, and his alone, commenced the encounter and he pursued the defendant at every opportunity until at last the defendant escaped from him and then the tables becoming reversed he made haste to depart, leaving his chaps and horse behind him.

In our minds, he came seeking trouble, he inflicted as much as he could by force upon an older and physically inferior man. Much that is said in State v. Nickerson, 126 Mont. 157, 247 P. 2d 188, is applicable here.

While it is true that defendant did fire the shotgun at the complaining witness (Moulette's version) or in the general direction of his flight (Blair's version) one can but think—in the circumstances that existed as described by either complaining witness or defendant—what would any reasonable man under like circumstances do? We feel that the complaining witness invited defendant to do what he could in retaliation by his continuous commission of acts which constituted an assault upon defendant.

It should also be noted that the jury fixed the penalty at imprisonment, yet the district judge in his wisdom saw fit to impose that penalty, promptly suspend its execution, and place the defendant on probation.

After a most careful consideration of all the evidence presented by the record before us, the facts and circumstances are much like the intruder in a man's home. Because he has been discovered and is retreating, yet he is still an intruder. Similarly, by analogy to self-defense in homicide, when defendant is the assailant, before he can claim justification for self-defense, he must first in good faith have sought to withdraw from the combat. Here the complaining witness was the intruder, the assailant, and never sought in good faith to withdraw. Rather, the defendant, to protect himself and his right

to the sanctity of his own castle was using force to "keep him scared." In other words, defendant had as "good cause or reason" (see State v. Storm, 124 Mont. 102, 104, 220 P.2d 674) as any reasonable man to defend himself and his home.

■ Since the judgment must be reversed, in view of what has been heretofore said we go a step further, and say that the evidence fails to justify or sustain a conviction for assault in any degree.

The judgment is reversed and the cause is remanded to the district court with directions to dismiss the information.

MR. JUSTICES ADAIR, DOYLE and CASTLES concur.

MR. JUSTICE JOHN C. HARRISON:
I dissent.