THE STATE OF MONTANA, Plaintiff and Respondent, v.
GARY LEE QUIGG, Defendant and Appellant.

No. 11743.
Decided April 3, 1970.
Rehearing Denied April 30, 1970.
467 P.2d 692.

Derry, Hanser & Derry, Billings, Harold F. Hanser, argued, Billings, for appellant.

Robert L. Woodahl, Atty. Gen., Billings, Patrick J. Brophy, Asst. Atty. Gen., argued, Helena, John L. Adams, Jr., County Atty., argued, Billings, for respondent.

MR. JUSTICE CASTLES delivered the Opinion of the Court.

This is an appeal from a judgment of conviction of murder in the first degree entered on a jury verdict. Defendant was sentenced to life imprisonment. A motion for new trial was denied.

Defendant Gary Lee Quigg was charged by Information in the district court in Yellowstone County on August 5, 1968, with the crime of first degree murder of one Lee R. Robbins, who was killed on April 8, 1968. On October 21, 1968, a motion to suppress evidence seized under authority of certain search war-

rants was heard by Judge C. B. Sande and granted in part and denied in part.

The case was first tried on January 13, 1969 and the jury was unable to reach a verdict. The case was tried a second time on March 31, 1969 and a verdict of guilty returned.

The body of Lee R. Robbins was found on a county road near the Billings airport at approximately 10:45 p. m. on April 8, 1968, by two college students who were driving up the road on which the body was lying. Lee R. Robbins had been killed by two bullets in his head, bullets which were later shown to have been fired from his own gun which he had had under the front seat of his car. His pockets, with the exception of his left, were turned inside out; his wallet was missing; his watch was missing; his car was gone; and various small items were scattered in the area of the body.

Lee R. Robbins left his home at about 9:45 p. m. to go to the airport to meet his boss, a representative of the company which employed him. Robbins was a drug salesman for William H. Rorer, Inc., a pharmaceutical company which deals in drugs dispensed through pharmacies. Robbins carried in his car drug samples. On his way to the airport, Robbins stopped at the Rimrock Lodge to verify reservations previously made for his boss. At the Rimrock Lodge the desk man spoke with Robbins and testified that Robbins mentioned he had been followed by an automobile with which he had had a near accident earlier.

Robbins was next seen at the airport where he spoke with various acquaintances. He was last seen alive at the airport terminal between 10:25 and 10:30 on the night of April 8, 1968, at which time he was heading out towards the terminal entrance to check on his car. His body was found 15 to 20 minutes later near the airport. His boss arrived on schedule, waited in vain for Robbins, and finally went to his motel.

The investigation of the scene where the body of Robbins was discovered was conducted by law enforcement officers on the night the body was found, and again at daylight the following

morning. Robbins had been slain of the result of two bullet wounds of a .22 caliber; one wound at the right ear and one at the left ear. During the search of the area, two .22 caliber shell casings were discovered near the body position.

The automobile belonging to Robbins was discovered the next morning in downtown Billings in a parking lot. Robbins' wallet was found in it but contained no money; other contents of the wallet were strewn about the floor of the car. Also scattered around the automobile were drug supplies which were the supplies used by Robbins in his work as a drug salesman. The automobile was fingerprinted and vacuumed but no results were produced linking the defendant to the automobile.

The investigation continued; about two months elapsed. On June 11, the Ten Inn bar, located between Park City and Columbus, Montana in Stillwater County, was found to have been burglarized and ransacked. A German shepherd watchdog was found dead, having been shot. Two .22 caliber shell casings were found on the floor, one under a bar stool and one in a hallway near the dog's body.

On June 23, one Richard Cammack was arrested by Carbon County Sheriff Eichler and Highway Patrolman Mead on a charge of receiving stolen property. Cammack had a case of beer in his possession. Shortly thereafter Cammack was charged with the burglary of the Ten Inn bar. He at first did not implicate others, and, in fact, plead guilty to the crime of burglary; but the following day he told officers that two men were with him on the burglary, Gary Quigg and Mort Reid.

The homicide investigation into the death of Lee R. Robbins continued. The Federal Bureau of Investigation (hereinafter referred to as FBI) Laboratory in April had examined, among other things, the two .22 caliber shell casings found near the body of Robbins. It was determined that they each had been fired from the same .22 caliber gun. It was also determined, at that time, they had marks typical of that produced by a .22 caliber Ruger pistol; but, the expert could not eliminate the

possibility of a different make or style of .22 caliber gun being involved.

Subsequently, in July 1968, after the Ten Inn bar burglary, the same FBI laboratory expert received one of the .22 caliber shell casings found on the floor of the Ten Inn bar. His examination of that shell disclosed it had been fired from the identical gun that had fired the two shell casings found at the Robbins homicide scene. Again the type of marks indicated a Ruger pistol, but could not be narrowed down to one particular weapon.

In the meantime, police investigation continued. The same weapon was involved in Robbins' death and in the two month later burglary. Also, at this time, among other things, the officers had involved Cammack, Quigg and Reid in the burglary. Cammack testified that Quigg, defendant here, had shot the dog with an automatic pistol. The search was narrowing down.

Defendant Quigg was arrested on August 2, as were Reid and Cammack.

On that same day a petition for a search warrant was filed which read:

"Comes now Richard Schafer, a Police Officer for the city of Billings, Montana, and being first duly sworn, on oath, alleges as follows:

"I.

"That he is a Police Officer for the City of Billings, Montana, assigned to the Detective Division;

"II.

"That on April 8, 1968, in Yellowstone County, State of Montana, a person by the name of Lee Robbins was killed by a person or persons unknown and the homicide is presently under investigation;

"III.

"That at the scene where Mr. Robbins' body was found there were found the shell casings of a gun similar in caliber to the gun with which Mr. Robbins was shot;

"IV.

"That the shell casings above mentioned were retained by the Billings Police Department and subsequently in June, 1968, there were found at the scene of another crime committed in Stillwater County, shell casings which were compared by the Federal Bureau of Investigation Laboratory to those found at the scene of Mr. Robbins slaying and the shell markings on said shell casing indicate they were fired by the same gun.

"V.

"That in the crime committed in Stillwater County, three (3) persons namely, Richard D. Cammack, William Morris Reid and Gary Lee Quigg, were apprehended for said crime and one of these persons indicated that the gun used in commission of the crime in Stillwater County, which discharged the shell casings identical with the shell casings found at the scene of the Lee Robbins homicide, has been fired by one of the three (3) persons involved in said crime.

"VI.

"That Gary Lee Quigg is known to have had .22 guns in his possession, a caliber, which is identical with the gun caliber that killed Mr. Robbins and said guns were believed kept in the home or kept in automobiles in possession of said Gary Lee Quigg;

"VII.

"That at the time of Mr. Robbins' killing certain papers, money and a watch disappeared;

"VIII.

"That for aforesaid reasons and in the reasonable belief that said person, Gary Lee Quigg has in his possession or in his vehicle the said property, the petitioner prays that a Search Warrant be issued allowing the Billings Police Department of Billings, Montana, to search the premises of a one-story house, color white, with basement, exact size of house unknown, located at 236 Custer Avenue, Billings, Montana, the property of Harold M. Learn and Mabel G. Learn, and the residence address given by Gary Lee Quigg as his home also detached garage next

to building, and then and there to seize and take into their possession any .22 caliber pistol, a gold wristwatch with expansion band or any other property or evidence they might discover that may connect to the demise of Lee Robbins.

"S/ Richard E. Shaffer
Richard Shaffer

"On this 2nd day of August, 1968, before me E. E. Collins, Justice of the Peace, personally appeared Richard Shaffer, known to me to be the person whose name is subscribed to the within instrument and being first duly sworn and examined by me; he did acknowledge that he executed the same.

"S/ E. E. Collins
E. E. Collins
Justice of the Peace."

Justice of the Peace Collins issued the search warrant in these words:

"THE STATE OF MONTANA TO ANY SHERIFF, CONSTABLE, MARSHAL OR POLICEMAN, Richard E. Shaffer, Police Officer, in the County of Yellowstone, State of Montana;

"Proof by Petition under oath having been this day made before me by Richard E. Shaffer, a Police Officer for the City of Billings, Montana, seeking issuance of a search warrant for the premises located at 236 Custer Avenue, a one-story house, color white, with basement, exact size of house unknown, the property of Harold M. Learn and Mable G. Learn, and the residence address given by Gary Lee Quigg as his home also detached garage next to building;

"You are hereby commanded to make a search, in either day or night of that house located at 236 Custer Avenue, a one-story house, color white, with basement, exact size of house unknown, the property of Harold M. and Mabel G. Learn, for the following described property: Any .22 caliber pistol, a gold wristwatch with expansion band or any other property or evidence they might discover that may connect to the demise of Lee Robbins; and if you find the same, or any part thereof, to bring it forth-

with before me, at my Courtroom, in the Courthouse in said Yellowstone County.

"Given under my hand, and dated this 2nd day of August, 1968.

"S/ E. E. Collins
Justice of the Peace."

On the same day search warrants were issued in Carbon County with the same language on the items to be seized. One search warrant was for the residence of defendant Quigg and the other for a described automobile.

A return on the search warrant in Billings was made covering these items:

"One (1) super X 22 cartridge from FFA coat

"One (1) scrapbook of guns

"One (1) empty red, white and black box labeled Sturm Ruger 22 Automatic long rifle, catalog No. RST 4-4¾ inch barrel and number 300657 on the red, white and black box.

" (7) Super X 22 cartridges (hollow point)

"One (1) 22 Caliber rifle, Remington model 514 single shot."

On the search warrants in Carbon County certain items were seized including thirteen (13) tablets William H. Rorer, Inc., a brown cigarette, one switch blade knife, and one bottle of Robitussin A-C. Of the foregoing items seized in Yellowstone county and in Carbon county, only two, the gun box and the pills referred to as tablets were admitted into evidence. The remainder were suppressed. More will be said concerning these matters in our discussion of specification of error No. 1.

The weapon, a .22 caliber Ruger pistol, serial number 300657 appeared. One Z. P. Eldridge came to the police station on August 2, the same day of the arrests and searches, and gave the police a receipt for a .22 Ruger pistol from the Frank Laudy Secondhand Store. Frank Laudy turned the pistol over to the police with his records. The pistol was sent to the FBI laboratory and examination disclosed it to be the weapon which had fired the two shells found at Robbins' body and one of the shells

found at the Ten Inn bar burglary scene. The pistol was traced in the evidence and testimony in two directions, one to Robbins, the deceased, and the other to Quigg, the defendant.

Following the arrests of Quigg, Reid, and Cammack and the seizure of the items, an Information charging murder in the first degree was filed against Quigg for the murder of Lee R. Robbins. Counsel was appointed. A motion to suppress evidence was subsequently filed and a hearing had.

As related earlier, the first trial resulted in a "hung" jury. The second in conviction. A motion for new trial was made, hearing had, and denied.

Appellant Quigg lists seventeen separate specifications of error.

Appellant contends that the trial court erred in refusing to grant defendant's motion to suppress evidence. The trial court suppressed all items except two particular items, the gun box with the serial number that matched the murder weapon and the pills that were found in a drawer in Quigg's dwelling in Red Lodge. The pills were in cellophane packages of the make and style used by the deceased as samples. The gun box was found in a box containing Quigg's clothes in the garage at 236 Custer Avenue.

These two items are the subject of appellant's specification of error No. 1. Appellant argues that (1) probable cause was not shown for the issuance of the warrants; (2) the description of the place to be searched was faulty; and (3) the items to be seized were not described with sufficient particularity.

We have heretofore set out the fact situation that confronted the police. They laid before the magistrate the petition heretofore quoted.

Section 95-704, R.C.M. 1947, provides:

"Grounds for search warrant. Any judge may issue a search warrant upon the written application of any person that an offense has been committed, made under oath or affirmation before him which:

"(a) States facts sufficient to show probable cause for issuance of the warrant,

"(b) Particularly describes the place or things to be searched, and

"(c) Particularly describes the things to be seized."

The Criminal Law Commission Comment in regard to section 95-704, states in part: "The intention of this section is to follow U.S. Supreme Court decisions on this point. (e. g., Jones v. U.S., 362 U.S. 257 [80 S.Ct. 725, 4 L.Ed.2d 697] ; Aguilar v. State of Texas, 84 S.Ct. 1509, 378 U.S. 108 [12 L.Ed.2d 723] (1964)."

Section 95-705, R.C.M.1947, provides:

"Scope of search with warrant. A search warrant may authorize the seizure of the following:

"(a) Contraband.

"(b) Any instruments, articles or things which are the fruits of, have been used in the commission of, or which may constitute evidence of, any offense. * * *."

The Criminal Law Commission Comment in regard to section 95-705, states:

"The intent of this provision is to set out as expansively as possible the items which may be seized under a search warrant. This section basically codifies present law established by federal and state cases. (See State v. Bisaccia, [45 N.J. 504] 213 A.2d 185).

"This provision does not eliminate the necessity of 'particularly describing' the place to be searched or the things to be seized as is required by section 95-703, the Montana Constitution, Art. III, section 7, and the United States Constitution, Amendment 4.

"The courts are not clear and exacting as to the requirement of description. Describing an apartment building generally, and not an implicit apartment is not sufficient. People v. Estrada, [234 Cal.App.2d 136] 44 Cal.Rptr. 165. Where books are to be seized the most 'scrupulous exactitude' must be used when the basis for their seizure is ideas which they contain.

Stanford v. Texas, 85 S.Ct. 506 [379 U.S. 476, 13 L.Ed.2d 431]. Thus a determination of particular description necessary to meet the statutory and constitutional requirements may be made only in view of the facts and circumstances of the particular case.''

The probable cause for issuance of the search warrant seems to us to appear clearly from the recitation in the petition. In Aguilar v. Texas, 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723, the United States Supreme Court set forth the test in this statement:

''* * * when a search is based upon a magistrate's, rather than a police officer's, determination of probable cause, *the reviewing courts will accept evidence of a less 'judicially competent or persuasive character than would have justified an officer in acting on his own without a warrant,' and will sustain the judicial determination so long as 'there was substantial basis for [the magistrate] to conclude that narcotics were probably present * * *.'* ''* (Emphasis added.)

Here, the search warrant application, although not involving narcotics, has the substantial basis for a conclusion. Also in Spinelli v. United States, 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637, sufficient facts for independence of judicial determination of reliability are required. We have them here.

Thus, was there a substantial basis for the magistrate to conclude that a .22 caliber weapon, taken from the deceased's automobile, used to kill him, used by Quigg to perpetuate a burglary, and seen in his possession, was probably present in one of the places to be searched? We think a reasonable person would so conclude.

Appellant goes on to urge that since the .22 caliber pistol was not described with the particulars of make, serial number or other identifiable features, but, rather, in the only terms the police officers then knew, that this makes it a ''general warrant'' and therefore constitutionally invalid. Appellant emphasizes the word *''any''* .22 caliber pistol as well as the words,

"*any other*" evidence they might discover that "*may*" connect to the demise of Lee R. Robbins. In the context, and under the facts and circumstances then known to the law enforcement officers, the language is not, in our view, language that would be considered "general". The deceased had been robbed before slain, his automobile stolen and burglarized. Exactly what was taken and with detailed exactness, only the deceased and the criminal or criminals involved knew; but, papers, money, and a gold watch were shown to be missing. Because of the rifled condition of the automobile, the possibility of missing drug items was there but no particulars of what might be missing were known.

In Warden, Maryland Penitentiary v. Hayden, 387 U.S. 294, 87 S.Ct. 1642, 18 L.Ed.2d 782 (1967), the United States Supreme Court, speaking through Mr. Justice Brennan, discussed search and seizure concerned with a search of a home without a warrant where police had information that an armed robber had entered it five minutes previously. The Court, among other things, said:

"The 'mere evidence' limitation has spawned exceptions so numerous and confusion so great, in fact, that it is questionable whether it affords meaningful protection. But if its rejection does enlarge the area of permissible searches, the intrusions are nevertheless made after fulfilling the probable cause and particularly requirements of the Fourth Amendment and after the intervention of 'a neutral and detached magistrate' ".

The Court in *Hayden* also discussed Gouled v. United States, 255 U.S. 298, 41 S.Ct. 261, 65 L.Ed. 647. It stated:

"The premise in Gouled that Government may not seize evidence simply for the purpose of proving crime has likewise been discredited. The requirement that the Government assert in addition some property interest in material it seizes has long been a fiction, obscuring the reality that government has an interest in solving crime. Schmerber settled the proposition that it is reasonable, within the terms of the Fourth Amendment, to

conduct otherwise permissible searches for the purpose of obtaining evidence which would aid in apprehending and convicting criminals. The requirements of the Fourth Amendment can secure the same protection of privacy whether the search is for 'mere evidence' or for fruits, instrumentalities or contraband. There must, of course, be a nexus—automatically provided ·in the case of fruits, instrumentalities or contraband—between the item to be seized and criminal behavior. Thus in the case of 'mere evidence,' probable cause must be examined in terms of cause to believe that the evidence sought will aid in a particular apprehension or conviction. In so doing, consideration of police purposes will be required. Cf. Kremen v. United States, 353 U.S. 346, 77 S.Ct. 828, 1 L.Ed.2d 876. But no such problem is presented in this case. The clothes found in the washing· machine matched the description of those worn by the robber and the police therefore could reasonably believe that the items would aid in the identification of the culprit.''

■ That items or things other than those described in the warrant may be seized is clear so long as a reasonable relationship between the search authorized by the warrant and the seizure of the thing not described is demonstrated. State v. Pietraszewski, 172 N.W.2d 758 (Minn. 1969), and see discussion in Gurleski v. United States, 5 Cir., 405 F.2d 253. Here we have the gun box, identified by serial number with the murder weapon, which had been described in general terms by the widow as being kept in the automobile of the deceased. As to the pills — the facts as to the rifling of the drug supplies in the automobile which belonged to the deceased, a drug salesman known to distribute Rorer company products, and other matters, make for the reasonable relationship between them and the item sought, the missing weapon. Thus, the two items seized are not seized as a direct result of the description of items described on the search warrant, but rather as a result of the lawful right to search and their reasonable relationship to the crime involved and the items authorized to be searched for.

The fact that the warrant went on to describe ''any other property or evidence they might discover that may connect to the demise of Lee Robbins'' does not, in our view, change the character of an otherwise valid search warrant to an invalid one. The trial court suppressed most items, and we need not discuss whether those items were reasonably related to the items sought.

The rationale applied in *Hayden* fits here. The particularity of description, under the facts and circumstances here shown, is satisfied. The probable cause for issuance of the warrants exists.

As to the particularity of place, the appellant cites State ex rel. King v. District Court, 70 Mont. 191, 224 P. 862. In the *King* case there were shown to be three dwellings on the quarter section described. This Court held that sufficient particularity was not shown as against evidence produced, on a motion to suppress. In the instant case the exact address is given. Appellant makes an issue that the city of Billings was not set forth. However, such a technicality, where the warrant is sought by Billings city police in a Billings justice court of a well-known residential street with the names of the property owners, does not render the location questionable in any manner.

We find no error in specification of error No. 1.

Specification of error Nos. II, III and IV are concerned with instructions given by the trial court. The court's No. 27 is a felony-murder instruction. Court's No. 4 is the statutory definition of robbery and court's No. 18 is an instruction on circumstantial evidence. In each instrument, no error nor any prejudicial effect is shown and we shall not burden this opinion with a discussion in detail.

Specification of error Nos. V and VI concern the refusal of the trial court to give two instructions, defendant's proposed 5 and 7. Defendant's proposed instruction No. 5 read:

''You are instructed that the evidence in this case fails to show any motive on the part of the accused to commit the crime charged, this is a circumstance you should consider.''

Of course, it is immediately apparent that the instruction, being a command to the jury, is not a proper instruction under the circumstances shown here. Appellant puts much emphasis on the fact that this is a circumstantial evidence case; and, therefore, that even though the State is not required to prove motive the jury should be instructed that failure to prove motive is a circumstance to be considered. In State v. Vanella, 40 Mont. 326, 106 P. 364, appears a discussion by Justice Holloway of an instruction somewhat similar. However the Court was there considering whether modification of an instruction that included the words "is a circumstance in favor of his innocence" by striking "in favor of his innocence" was error. It held it was not, but significantly the determination of motive was left in the hands of the jury and not directed by the Court. Here, no error is shown.

Defendant's proposed instruction No. 7 refused, was the language of section 94-2510, R.C.M. 1947. However, the corpus delicti proof and proof beyond a reasonable doubt of the criminal agency of the death was included in an instruction given as court's No. 16. No error is shown.

Specification of error No. VII is that the court erred in refusing to grant defendant's motion for a mistrial based on alleged police intimidation of witnesses Z. P. Eldridge and Clyde Eldridge. The witness Z. P. Eldridge had pawned the .22 Ruger pistol, the death weapon, which had been Robbins' own gun. It was Z. P. Eldridge who brought the pawn slip to the police station, by means of which the officers were able to get the gun. Z. P. Eldridge, in turn, had gotten the gun from his brother, Clyde. Clyde had gotten the gun from defendant Quigg.

Clyde Eldridge was called as a witness for the State and testified as to the gun. After cross-examination by counsel for defendant, the transcript shows:

"MR. HANSER: No further questions.

"A. I have one thing I would like to ask, if it is okay?

"THE COURT: No, you may not. A. No?"

A recess was taken and in Chambers, in the absence of the jury, what we will describe as a long discussion was had between the witness Eldridge, counsel for the State, counsel for the defendant and the district judge. Eldridge had many complaints, mostly about the police officers and the prosecuting attorney; but the trial judge on several occasions questioned Eldridge on the truth of his testimony concerning the gun before the jury. Eldridge assured the judge that his testimony was true. At the end of the exchange the record is:

"THE COURT: Now, let this gentleman go out, and I would like to have this other gentleman brought in, Mr. Z. P. Eldridge. It is understood that he is, that Clyde Eldridge is still under subpoena?

"MR. McNAMER: Yes."

[At this point the record is silent as to the discussion had with Z. P. Eldridge.]

The record goes on:

"(Whereupon Court resumed, pursuant to recess, parties present the same as before and the following proceedings were had in the presence and hearing of the Jury:)

"MR. Z. P. ELDRIDGE: I would like to talk to an attorney to get legal advice before I am sworn in.

"MR. McNAMER: May we have a recess.

"(Whereupon Court recessed following the usual admonition to the Jury and the following proceedings were had in Chambers in the absence of the Jury. Counsel present, William R. McNamer, Chris Nelson and Harold Hanser.)

"PROCEEDINGS HELD WITH REFERENCE TO Z. P. ELDRIDGE:

"THE COURT: Now, what was bothering you, Mr. Eldridge;, in the Courtroom?

"MR. ELDRIDGE: Well—

"THE COURT: I might say this, and then you can have your say. The only thing I am interested in is that Mr. Quigg gets a fair trial.

"MR. ELDRIDGE: That is right.

"THE COURT: That is all I am interested in.

"MR. ELDRIDGE: Right.

"THE COURT: Now, what you might do in the courtroom could hurt him, do you understand that?

"MR. ELDRIDGE: Yes.

"THE COURT: What is bothering you about testifying?

"MR. ELDRIDGE: Well, a few days ago they took my brother first and then they take him to the courthouse and they played a tape on him, and they played it all the way through on my brother, and then when I went in there, that guy there—

"MR. McNAMER: Now you are pointing at me, the prosecutor of this case?

"MR. ELDRIDGE: Right, He was in the room, him and I— I think it was Shaffer, the guy that. is, walked out of the courtroom named Capt. Shaffer, I think it was him—at the time I walked into the office, the phone rang and they sent him to answer the phone.

"MR. McNAMER: That is they—

"MR. ELDRIDGE: To answer the phone. Shaffer played a tape on me, and the tape he played were really, was scared, threaten my life, what Gary was going to do to me; Gary was going to—if he was found guilty, he was going to kill me and my brother, and then he was going to take us along with him, and then really, they tried to get me to tell a lie.

"THE COURT: All right, now let me interrupt one minute. You testified in the first trial, did you not?

"MR. ELDRIDGE: Yes.

"THE COURT: And, Mr. McNamer, may I ask you this, your purpose of using this man as a witness is to prove the fact that he got the gun from his brother, is that right?

"MR. McNAMER: That is right.

"THE COURT: And it is limited to that, isn't it?

"MR. ELDRIDGE: But, Your Honor,—.

"THE COURT: Just one minute and you will have your say.

"MR. McNAMER: Yes, the questions would be the same as at the previous trial, I did want to ask you whether—

"MR. ELDRIDGE: What you mean by previous?

"THE COURT: When you testified before in Court.

"MR. ELDRIDGE: Well, see—look—them questions what you really asked me—some of them they weren't supposed to ask me. They were where did I get the gun from and everything, that is what they really were supposed to ask me, and then they asked me a whole lot more questions.

"DIRECT EXAMINATION

"BY MR. McNAMER:

"Q. You mean in Court, you mean at the last trial. A. Right, the only thing I was supposed to clear myself, how I got the gun, that is what they was supposed to—

"Q. And who you gave that to? A. Right, that is the only thing I was supposed to say in Court, really.

"Q. Well, I wanted to ask whether you had been at a fight, that Gary had with another kid while in the cast. A. Well, I will be honest, I saw Gary quite a few times around at the poolhall, but all this time, me and Gary had some run-in too, when my nephew left and went back to Memphis, Tennessee, I walked over to the Greyhound Bus station and Gary was there and my brother, and then I asked Gary to take me out by the shopping center to the drug store and I would give him a dollar and that is the only thing Gary and me had—

"Q. Did you ever see him in a fight? A. No.

"Q. Well, you wanted to ask him—do you mind if I ask you about that? A. I ain't supposed to answer that because I had nothing to do with that.

"Q. Well, I will just ask you then about getting the gun and who you gave it to. A. Right.

"THE COURT: Now do you have anything—

"CROSS-EXAMINATION

"BY MR. HANSER:

"Q. Did Gary Quigg ever threaten you Z. P.? A. No, Gary

don't even really know me. The only way he know me. is just by seeing me and then they accused me of going up the, up to the jail to see Gary.

"Q. Are you afraid of Gary? A. No.

"Q. Did the police threaten you, Z. P.? A. Well, when I got out of lying, when he kept asking me the same question over and over again, I got kind of smart with him and I said a couple of bad words to him and then he threatened to hit me.

"MR. McNAMER: Who did? A. The police—you was in the office when he did that.

"MR. McNAMER: No. A. Yes, you were.

"MR. McNAMER: He didn't threaten you. A. He said, 'Z. P., you know better than that, one more time and he says if you don't shut up I am going to do something to you, I am going to hit you.'

"MR. McNAMER: He didn't say hit you. A. Yes, he did.

"THE COURT: Let me interrupt again. Now Mr. Eldridge, the reason we are in here is that what you did in the courtroom is actually detrimental to Mr. Quigg, do you understand that? A. Is what?

"THE COURT: Is hurting Mr. Quigg's trial. A. I didn't—

"Q. (By Mr. Hanser) Yes, it is, and I want to know, is it because you are afraid of Gary Quigg or was it because you are afraid of the police that you weren't going to testify in that courtroom? A. Well, I am going to be honest, see, I was going to bring this up in the courtroom about the tape, I don't want them to come up with another story on me and that is why I brought it up.

"MR. McNAMER: I want the record to show that if Mr. Hanser is going to claim that he had already been prejudiced, and if he is going to base it upon alleged threats by the police department, that I want to make a full record, sworn, with the witnesses sworn, with all the people involved.

"THE COURT: Well now, let me interrupt once more. If you were asked in the courtroom in front of the Jury whether

your brother gave you a gun similar to the one that is in there, what would your answer be? A. Well, I would be right, he did not give it to—no, it wouldn't be that—I would say that he didn't give it to me, I give him some money on it.

"THE COURT: What? A. I gave him some money.

"MR. McNAMER: He hocked it to you?

"THE COURT: In other words, did you receive— A. The gun, yes, I did. ·

"REDIRECT EXAMINATION
"BY MR. McNAMER:

"Q. You received a gun similar to the one in the courtroom from your brother? A. Yes, I did.

"Q. Last year? A. Yes, last year, but I don't know at what time.

"Q. Now if you made that statement in Court, would that be the truth? A. Yes.

"Q. And you are not saying it because you are afraid of the police? A. No. but I got proof.

"THE COURT: All right now, if Mr. McNamer asks you in the courtroom what you did with the gun what would you say? A. I would tell the truth.

"Q. What it is? I told—I kept the gun for about—it is maybe three months, now I let different people use it and one I got proof on it—he saw me with the gun because I had to—I got broke and so I asked my cousin, Robert Smith will he take it up to Mariano at the poolhall and hock it to him for $10.00 and I would give him $15.00 back, Mariano owned the poolhall, and the reason I did not take it in because I was in the poolhall at that time and then, bring the gun back to me.

"Q. Who did that? A. My cousin, Robert Smith—he is going to go on the stand—so he should have brought it back to me, and he had another guy to hock it for him, and the reason he had another guy to hock it for him, on account of because he had a gun in that same shop, and then that guy owned the shop, I went in there three or four times and tried to hock the gun

and he refused me, and I could not go in there, and I could have went in but the only reason I did not go in there because I had a gun to hock already.

"Q. Did you get the hock slip back on the gun? A. Yes.

"Q. And I will show you this and you can recognize that, can't you? A. Well, I wouldn't be for sure.

"Q. I think you did last time. A. No, I didn't last time.

"Q. You didn't? A. No.

"Q. You say it looks like it? A. Yes, it looks like it because —I won't say—that is—because the police are out to—

"Q. And then did you go up the—I think you testified last time that you went up there to get it? A. Yes.

"Q. That same day that you came up to the police station? A. Right.

"Q. Is that right? A. Yes, because it wasn't in the hock shop all this time—that's it—my brother asked for it back to go up to the police station because I don't want no trouble about having the gun.

"RECROSS-EXAMINATION

"BY MR. HANSER:

"Q. When the police played this tape to you, Mr. Eldridge— A. Yes.

"Q. —did they tell you that were not telling the truth, when you testified at the first trial? A. Well, they really didn't come out and tell me that and in a way they were telling me all the time I was lying, and they told me this way, that we, if you do testify again, Quigg, and he gets some time, he is going to do something bad to you and in a lot of ways, and really they really tried to get me to lie on Quigg, they tried to get me to tell a lie on him and I don't even hardly know the man.

"THE COURT: Well you know what Mr. McNamer has requested which would take another morning anyway and this gentleman if he talks and he is going to hurt Quigg—

"MR. McNAMER: What do you mean?

"THE COURT: If he gets up there and is on the stand too long I think you are—

"MR. McNAMER: I think we have got to have him for the gun.

"THE COURT: I think you have to, too, Bill, but—

"MR. HANSER: Are we through with Mr. Eldridge?

"THE COURT: No, I think—yes, he can step outside for just a moment.

"(Mr. Eldridge leaves the Chambers.)

"MR. HANSER: Let the record show that Z. P. Eldridge, Jr., was called to the stand as a State's witness, that he refused to be sworn, and testify, that there was conversation between the witness, Z. P. Eldridge, Jr., and the Court, and that thereupon there was an adjournment to the Chambers and the proceedings were held which immediately preceded this notation in the record. That based upon the testimony given by Z. P. Eldridge at this time, comes now the Defendant and moves this Court to declare a mistrial for the reason that the substantial rights of the Defendant, Gary Lee Quigg, have been jeopardized by the actions of the witness, Z. P. Eldridge, Jr., and that the actions of Z. P. Eldridge, Jr. were brought about and caused by being intimidated by the Billings Police Department in the playing to him of the tape, in which it was purported that Gary Lee Quigg had made threats upon the life of Z. P. Eldridge, Jr., and further that the police officer affirmed these threats, and that he further told this witness that if Gary Lee Quigg were released from custody or once having served his sentence, was released, that he would do him great harm, and that it was the impression of this witness that the police wanted him to lie, and for that reason and that reason alone this witness took the actions he did in front of the empaneled Jury, and the witness has further testified that Gary Lee Quigg had not made any threats to him, and that he, the witness, Z. P. Eldridge, was not in fact afraid of, or concerned about Gary Lee Quigg.

"MR. McNAMER: Comes now the State and challenges the

Defendant's statement as to what occurred in the courtroom, and challenges the record on that score, and which will disclose that the witness did not affirmatively or obviously refuse to be sworn, but simply approached the clerk and the Bench and asked in a low voice to the Court, or said that he would like to talk to a lawyer before he testified, and it is very questionable and doubtful, and there is no affirmative indication that this was heard by the Jury; that there was an immediate request for a recess by myself in order to avoid any taint on the record; that the proceedings were had in Chambers which are now in this record, that these proceedings were not under oath, that I have knowledge that the statements by Clyde Eldridge and Z. P. Eldridge are incorrect. It is correct that a tape was played to these men, a tape of a witness who heard Mr. Quigg make certain statements regarding threats to them. That the recording was not of Mr. Quigg but of this witness. That the Defense is aware of the contents of that tape and have seen the transcript of it a week ago, and if there is going to be any action, that the prosecution, the State requests the right for a full-dress hearing on this question, with the calling of witnesses including Capt. Shaffer, and if necessary myself, to go into the entire background, and we believe that this will show that there was no effort to coerce these witnesses from testifying or to do anything but get, elicit the truth from them.

"THE COURT: Let the record show that the motion for mistrial is denied, and it is my judgment that when Mr. Eldridge came into the Court, he came to the clerk's desk with his back to the Jury, and was at least 15 feet or more away from the Jury, and that it is my opinion that the Jury could not have heard the very limited statement that Mr. Eldridge made.

" (Whereupon, Court resumed, pursuant to proceedings had in Chambers, with parties present the same as before and the following proceedings were had in the presence and hearing of the Jury.) "

While a reading of the foregoing record, largely made

in Chambers out of the jury's presence, makes this reviewing Court realize the difficult problem confronting the trial court and counsel on both sides in dealing with what both briefs refer to as "unsavory and unpleasant" witnesses, yet the trial court did not restrict the defense from examining fully into the matter. The same Z. P. Eldridge was called as a witness, after the foregoing exchange, by the State. The defense did not cross-examine. The same two witnesses, Clyde and Z. P. Eldridge, were called as witnesses by the defendant. While appellant suggests in his brief that he did not have full opportunity to examine them, yet the record does not bear this assertion out. We find no merit in specification of error No. VII.

Specification of error Nos. VII, IX and XV are treated together by appellant. They are: that the court erred in refusing to grant defendant's motion for a mistrial based on the testimony of witness, Ben Hagerman; that the court erred in admitting State's Exhibit 7-A-N, which is a small photo of the defendant; and, that there was prejudice to the defendant in allowing testimony concerning his character and other crimes.

The testimony of Ben Hagerman concerned statements made to him by the defendant. Hagerman was the jailer of the county jail where the defendant was held in lieu of $20,000 bail. The exchange heretofore quoted between the witnesses Eldridge, the court, and counsel was complicated further. We are told in the appellant's brief that one Osier, an inmate of the state prison, was subpoenaed as a witness by the State but not put on the witness stand by either party as his mental competence to testify was questionable. Osier, so we are told in appellant's brief, was a witness who was supposed to have heard defendant Quigg make threats towards certain witnesses, including the Eldridges. The Eldridges were obviously hostile, unfriendly, and most reluctant witnesses. Ben Hagerman's testimony was not an attack on the character of the defendant, but went directly to proof of the guilt of the defendant. The defendant

stated, according to Hagerman, that if he got out on bond, "I would get rid of some witnesses".

The appellant then goes on to the exhibit, a photo of defendant wearing a beard, which the appellant describes as having been cut out of a mug shot. The photo was used to show the appearance of the defendant on or about the time of the murder of Robbins and was used as a means of identification by witnesses to show that they were familiar with the defendant at that time. The photo was accurate and other than appellant's characterization of it as being cut out of a "mug shot" we fail to see how it in any manner affects the character of the defendant.

Then, the defendant appellant adds to these matters the testimony about the burglary and killing of the dog at the Ten Inn bar as being prejudicial attacks on the character of the defendant. The appellant cites State v. Tiedemann, 139 Mont. 237, 362 P.2d 529, that proof of other crimes is not admissible to show depravity or criminal propensity, nor may such evidence be offered if it only tends to create a prejudice against the accused in the minds of the jury.

Here, however, the evidence concerning the Ten Inn bar burglary and the shooting of the watchdog was most relevant to the chain of evidence and the proof of the murder weapon and its use by defendant. The *Tiedemann* case relied upon by appellant recognizes that if the evidence is relevant to the proof of the crime charged it is admissible. See State v. Schlaps, 78 Mont. 560, 254 P. 858; State v. Hughes, 76 Mont. 421, 246 P. 959; State v. Semmens, 105 Mont. 113, 71 P.2d 913. We find no error in specification Nos. VIII, IX and XV.

Specification of error No. X is concerned with the admission into evidence of a deposit slip from the Security Trust & Savings Bank. Mrs. Robbins, the widow of the slain man, testified she received the deposit slip by mail from the bank. She knew her husband's handwriting. It showed a deposit by Lee R. Robbins on April 8, 1968 of $285.12, less cash received $150.

The appellant argues that no foundation was laid since a bank official did not testify. We shall not dwell on this as clearly Mrs. Robbins did establish sufficient foundation.

Specification of error No. XI goes to the admission into evidence of a photograph of the body of Lee R. Robbins at the scene of the crime. Seemingly the appellant argues that the photograph's only use was an inflammatory one. However, what this Court said in State v. Campbell, 146 Mont. 251, 261, 405 P.2d 978, 984, has application here:

"Photographs are admissible for the purpose of explaining and applying the evidence and assisting the court and jury in understanding the case. Fulton v. Chouteau County Farmers' Co., 98 Mont. 48, 37 P.2d 1025. When the purpose of an exhibit is to inflame the minds of the jury or excite the feelings rather than to enlighten the jury as to any fact, it should be excluded. State v. Bischert, 131 Mont. 152, 308 P.2d 969."

Specification of error No. XII challenges the chain of evidence and the admission of .22 caliber shell casings as State's exhibits 5N, 6N, and 7N. The objection of appellant was as to foundation and integrity of the exhibits. We have carefully gone over the long record wherein the State established the chain of evidence concerned with these exhibits. We can only summarize by saying that the foundation was laid in every detail and the integrity of the items maintained. The trial court very carefully made its determination of admissibility. See State v. Olsen, 152 Mont. 1, 445 P.2d 926, 25 St.Rep. 618.

Specification of error No. XIII is that the court erred in not allowing the testimony of a defendant's witness, one Donn Peden. As to this alleged error, we have no record of what Peden might have testified to; no offer of proof was made. The State objected to a question; a recess was taken and following the recess the objection was sustained. Whatever point or testimony the defendant sought does not appear. No error is apparent.

Specification of error No. XIV goes to rebuttal testi-

mony of State's witnesses Schafer and Walters in regard to an experiment conducted. The defendant had taken the stand in his own behalf. He testified in substance that he had found the murder weapon in a paper sack which he saw placed in a vacant lot by two men. He described the men as being between twenty and thirty years of age and of Indian or Mexican race, and that he made the identification from their general build and manner of talking. The experiment conducted by the officers, under substantially the same conditions and place described by the defendant, was described with any possible variations being pointed out. The trial court determined that the testimony was inadmissible.

In State v. Blair, 147 Mont. 87, 410 P.2d 450, we reviewed the rules on admissibility of evidence of experiment. There we said that admissibility of experimental evidence is largely within the discretion of the trial court. At page 93, 147 Mont., at page 454, 410 P.2d, of *Blair* we said:

"In State v. Keller, 126 Mont. 142, 148, 246 P.2d 817, 820, we reaffirmed the principle that admission of experimental evidence is one addressed to the trial court, but it was further stated: 'Substantial similarity of conditions is all that is necessary to render such evidence admissible. 20 Am. Jur., Evidence, §756, p. 628. ''Whether the circumstances and conditions are sufficiently similar to render the results of the experiment competent is of course a preliminary question for the court, and unless too wide of the mark, the ruling thereon will be upheld on appeal.'' State v. Phillips, 228 N.C. 595, 46 S.E.2d 720, 722.'

"This court feels, however, that due to the several conflicting versions of the shooting, and the fact that the truthfulness of the witnesses, in the eyes of the jury is of such great importance here that any evidence or exhibits which would aid the jury in its determination which are within the realm of proper admittance should have been made available for the jury's consideration."

We find no error in specification No. XIV.

Specification of error No. XVI is that it was error to deny defendant's motion for dismissal based upon insufficiency of the evidence. The evidence was sufficient to support the verdict. The appellant's brief dwells on matters that were not proven, such as fingerprints, tracks, details of motive of robbery, or otherwise. Appellant suggests that others may have been involved. By what has been discussed heretofore in this opinion and other facts not set forth, clearly the jury had before it evidence upon which they could find the guilt of the accused. No error is shown.

Finally, specification of error No. XVII goes to the denial of a motion for new trial based on newly discovered evidence. On April 8, 1969, the jury returned its verdict of guilty. On April 9 and April 11, statements were taken from one Harvey Paugh and one Keith Eden. These statements, so appellant urges, would indicate that a car that fit the description of Robbins' car was observed as it was being parked, at a time shortly after the killing. The identification of the driver would be other than defendant Quigg. Counter-affidavits were filed by two police officers who investigated the facts and questioned the individuals. The affidavits of the police officers state that they found certain discrepancies in the statements and it was their opinion that the statements added nothing in the way of new evidence. The trial judge heard the motion. He was in good position to weigh the merits, having heard both trials. We, too, have examined the statements; if they add anything to the evidence beyond mere speculation, we are unable to find it. Appellant cites State v. Gangner, 73 Mont. 187, 235 P. 703, for the criteria to be used in determining whether a new trial should be granted because of newly discovered evidence. Section 95-2101, R.C.M.1947, provides for new trial motions. The criteria used in the *Gangner* case, although no longer set forth by statute, seem to be reasonable ones. However, here the affidavits, or more aptly the depositions, do not contain any material evidence that would likely produce a different result. What little sug-

gestion of material proof the affidavits did contain by way of speculation, was effectively answered by counter-affidavits. We find no merit in specification No. XVII.

We have examined all of the specifications of error and issues presented and have studied the trial record in detail and find no reversible error. The guilt of the defendant was established beyond a reasonable doubt to the satisfaction of the jury, and the trial judge denied the motion for new trial. The judgment is affirmed.

MR. CHIEF JUSTICE JAMES T. HARRISON, and MR. JUSTICES HASWELL and JOHN C. HARRISON, concur.