### STATE v. CHARLIE PHILLIPS.

(Filed 17 March, 1948.)

**1. Criminal Law § 38f—**

Experimental evidence is competent when the experiment is carried out under substantially similar circumstances and tends to shed light on the transaction in question, and while it is required that the experiment be carried out under substantially similar conditions, it is not required that the conditions be precisely similar, the want of exact similarity going to the weight of the evidence with the jury.

**2. Same—**

Whether the circumstances and conditions under which an experiment is carried out are sufficiently similar to those of the transaction in question as to throw light on that transaction and not tend to confuse or mislead the jury, is a preliminary question for the court in determining its competency, and the court's ruling thereon will be upheld unless too wide of the mark.

**3. Same—**

Defendant testified that the fatal shot was fired while the pistol was in deceased's right hand and defendant's hand on the barrel. There were no powder burns on the clothing of deceased. The fatal shell was of Hungarian manufacture. The State introduced evidence of experiments made with the pistol, using American manufactured shells, to determine the distance at which powder stains or burns would appear on the target. An officer who made the experiments testified that the amount of powder in a shell and the type of powder would affect discoloration but would not affect powder burns. *Held:* The conditions under which the experiments were carried out were sufficiently similar to render the evidence competent.

**4. Criminal Law § 81c (2)—**

The instructions of the court to the jury will be considered contextually, and when they are free from prejudicial error when so construed, exceptions thereto will not be sustained.

APPEAL by defendant from *Burney, J.,* at July Special Term, 1947, of HARNETT.

Criminal prosecution on indictment charging the defendant with the murder of one Etta Mae Phillips.

On Sunday afternoon, 18 August, 1946, Charlie Phillips and his wife, Etta Mae Phillips, were alone in their home—a small tenant house in the back yard of Harvey Stephenson—at Angier, Harnett County. Neighbors heard a pistol shot and in a few minutes the defendant emerged through the kitchen door and called to someone at the Stephenson home to get a doctor as his wife had shot herself. In a little while the doctor came and found Mrs. Phillips in the bedroom on the bed. She was dead. Soon the coroner arrived. Examination show that the deceased had been

shot with a pistol; that the bullet had grazed the top of the muscle of her right arm, entered the right chest about five inches from the shoulder-level, and had come out on the left side of the back about the level of the eighth rib, and had lodged in her slip or under dress. Further examination was made by the undertaker after the body had been removed to the funeral home. He stated that "by raising the arm it all matched the hole in the upper part of the chest, and if the arm was down by the side it didn't match, but when it was drawn up it did." There were no powder burns on the body of the deceased or her clothing. She died as a result of the pistol-shot wound.

The defendant told different stories as to how the shooting occurred. At first he said his wife attempted to shoot herself and he "tried to take the gun away from her and it went off." Later he said that his wife threatened to kill him and that he either slapped the gun out of her hand or twisted it out of her hand and in the struggle she was shot.

The solicitor then began an investigation and brought to light the following facts: The defendant had been married about eight years. Two children were born of the union. The defendant and his family had moved from place to place as tenant farmers. The defendant was addicted to the use of alcoholic drink, and, on numerous occasions had quarreled with his wife; several times he had threatened to kill her. The story is one of domestic infelicity.

In the Fall of 1945, the defendant entered into a bigamous marriage with a woman in Raleigh, which greatly increased his troubles, domestic and otherwise. In the Spring of 1946, he told Cliff Hamilton that he was "messed up" with a girl in Raleigh, and that "he didn't know what in the hell to do unless he killed somebody to get them out of the way." Similar statements were made to others on different occasions.

About ten days or two weeks before his wife's death, the defendant borrowed the pistol, with which his wife was shot, a Hungarian .37 milometer, from James Wimberly, who got it from a Hungarian colonel while overseas. It had one cartridge in it. The defendant told Cecil Stephenson that he had "had a quarrel with his wife and was going to kill her." He had in his pocket at the time a pistol which resembled the death pistol.

The defendant was arrested and charged with uxoricide. He was convicted at the September Term, 1946, Harnett Superior Court, of murder in the first degree and sentenced to death. The judgment was affirmed on appeal. 227 N. C., 277, 41 S. E. (2d), 766.

Thereafter a paper writing was found by the defendant's sister in the clothing of the deceased, which purported to be in the handwriting of the deceased and revealed a purpose on her part to commit suicide. On the basis of this newly discovered evidence a new trial was ordered.

The defendant, who did not testify on the first trial, but was a witness in his own behalf at the second trial, said that he came to dinner around 2:30 on the day of the homicide and found his wife standing in the back of the house looking out the window; that he stepped into the kitchen to wash his face and hands and upon his return she was sitting at the table; that when he pulled up a chair and sat down she said, "You s.o.b., you have two-timed me the last time," pulled a gun from under the table and pointed it at her face; that "she stuck the gun in her face, did not stick it in my face"; that when he saw the gun he caught the barrel with his right hand and her wrist with his left hand; that she had the gun in her left hand; that "it fired with my hand around the barrel, in her left hand"; that he jerked it back and it went to the floor; that he reached down and got the gun and threw it on the dresser; that his wife fell to the floor, and that he picked her up and put her on the bed.

On cross-examination the defendant said his wife had the pistol in her right hand when it fired; that she was right-handed; that she was sitting in the chair when shot, and that he would not say the pistol was three inches from her arm when it went off, but "would say probably 6 inches."

The prosecution sought to discredit the defendant's testimony by evidence of experiments made by officers who fired the death pistol after the killing in an effort to determine the distance at which, when fired, powder stains or burns would appear upon the target. The targets into which the experimental bullets were fired were placed at distances ranging from 2 to 36 inches from the muzzle of the pistol. They were covered with white cheese cloth of the approximate thickness of the clothing which the deceased had on at the time of her death. In every instance when the pistol was fired from a distance of 2 to 18 inches, powder burns appeared on the target, diminishing in amount as the distance increased. The defendant objected to the introduction of this "manufactured evidence" because of the dissimilar circumstances under which it was produced. Objection overruled; exception.

The death cartridge was of German manufacture with special kind of powder to prevent the flash from being seen when fired at night. The experiments were performed with American ammunition.

Verdict: Guilty of murder in the first degree.

Judgment: Death by asphyxiation.

The defendant appeals, assigning errors.

*Attorney-General McMullan and Assistant Attorneys-General Bruton, Rhodes, and Moody for the State.*

*Neill McK. Salmon and Charles Ross for defendant.*

STACY, C. J., after stating the facts as above: The State contended on the second trial, as well as on the first, that the range of the death

bullet plus the absence of powder burns left the theory of suicide with no substantial basis of fact.

In support of this contention, the prosecution had experiments made to determine whether bullets fired from the death pistol at close range would show powder burns on the targets. They did. On cross-examination, one of the officers who made the experiments stated that "the amount of powder in a shell and the type of powder would have right much to do with discoloration, but it would have nothing to do with what we call powder burns. These are powder burns. That is what I am talking about."

The competency of experimental evidence depends upon its trustworthiness to aid in the proper solution of the problem in hand. *S. v. McLamb,* 203 N. C., 442, 166 S. E., 507; *S. v. Young,* 187 N. C., 698, 122 S. E., 667; *Draper v. R. R.,* 161 N. C., 307, 77 S. E., 231; *Cox v. R. R.,* 126 N. C., 103, 35 S. E., 237; *Arrowood v. R. R.,* 126 N. C., 629, 36 S. E., 151; Anno. 8 A. L. R., 18, S. 85 A. L. R., 479; 20 Am. Jur., 627; 32 C. J. S., 440. When the experiment is carried out under substantially similar circumstances to those which surrounded the original transaction, and in such a manner as to shed light on that transaction, the results may be received in evidence, although such experiment may not have been performed under precisely similar conditions as attended the original occurrence. The want of exact similarity would not perforce exclude the evidence, but would go to its weight with the jury. 1 Michie on Homicide, 832. Whether the circumstances and conditions are sufficiently similar to render the results of the experiment competent is of course a preliminary question for the court, and unless too wide of the mark, the ruling thereon will be upheld on appeal. *S. v. Holland,* 216 N. C., 610, 6 S. E. (2d), 217; *S. v. Plyler,* 153 N. C., 630, 69 S. E., 269; *Henderson v. R. R.,* 132 Va., 297, 111 S. E., 277; *Ruestis v. Aetna Life Ins. Co.,* 131 Minn., 461, 155 N. W., 643; 20 Am. Jur., 628.

"The general rule as to the admissibility of the result of experiments is, if the evidence would tend to enlighten the jury and to enable them to more intelligently consider the issues presented and arrive at the truth, it is admissible. The experiment should be under circumstances similar to those prevailing at the time of the occurrence involved in the controversy. They need not be identical, but a reasonable or substantial similarity is sufficient"—*Edwards, J.,* in *Shepherd v. State,* 51 Okla. Crim., 209, 300 P., 421.

True it is, unless the requirement of substantial similarity exist, or be duly observed, the experimental evidence should be rejected. *Caldwell v. R. R.,* 218 N. C., 63, 10 S. E. (2d), 680; *Blue v. R. R.,* 117 N. C., 644, 23 S. E., 275; *Neice v. N. & W. Ry. Co.,* 155 Va., 211, 154 S. E., 563; *McLendon v. State,* 90 Fla., 272, 105 So., 406; *Spires v. State,* 50 Fla.,

121, 39 So., 181, 7 Ann. Cas., 214; *People v. Solani,* 6 Cal., 103, 91 P., 654; *Com. v. Tucker,* 189 Mass., 457, 76 N. E., 127, 7 L. R. A. (N.S.), 1056. *Cf. Simpson v. Oil Co.,* 219 N. C., 595, 14 S. E (2d), 638. This is largely a matter to be decided in the light of all the attendant facts and circumstances. The measure of permissible variation in the conditions of the experiment from those of the occurrence is usually determined by whether such variation would tend to confuse or to mislead the jury. The object of every trial is to find the truth of the matter in controversy. If the experimental evidence contribute to this end, it is admissible; otherwise it should be excluded.  *S. v. Plyler, supra.*

While the experimental conditions here were not identical with those attending the matter under review, still they were sufficiently similar for the experimental results to throw light upon the controversy and to assist the jury in making true deliverance in the case, 20 Am. Jur., 628. Hence, the ruling of the court in admitting the evidence will be sustained. *S. v. Young, supra.*

The fact that the smokeless powder in the experimental cartridges was not the same as the flashless powder in the death cartridge would not perforce amount to such a difference in particulars as to render the experimental evidence inadmissible. As stated by one of the officers, it was not the powder discoloration they were interested in determining, but the powder burns, which result from firing a pistol such as the death pistol at close range, regardless of the kind of powder used. 22 C. J., 759.

Other exceptions pertaining to the admission of evidence have been pressed with vigor and confidence, but a careful perusal of the transcript leaves us with the impression that they, too, should be overruled.

A number of exceptions have been taken to the charge. Some of them are not altogether free from difficulty. The instructions to the jury are quite lengthy. They cover 124 pages of the record, and contain several inexact expressions, which the defendant has pointed out in exceptive assignments of error. However, considering the instructions as a whole, or in their entirety, and contextually, we are constrained to resolve the exceptions in favor of the validity of the trial. It is not apparent that the alleged errors affected the result. We are disposed to think they did not, especially in the light of the defendant's own testimony.

The verdict and judgment will be upheld.

No error.