STATE OF NORTH CAROLINA v. MACK EDWARD JONES

No. 14

(Filed 6 May 1975)

1. **Criminal Law § 45— firing of pistol — experimental evidence — admissibility**

    In a murder prosecution where deceased was shot and where defendant objected to admission of evidence of certain experiments conducted with the murder weapon on the ground that there was no evidence to indicate that the weapon was in substantially the same condition at the time of the experiments as it was at the time of the shooting, the failure of the State to show lack of substantial change in the weapon did not rise to the level of prejudicial error in the light of the fact that defendant offered no objection to the admission of the pistol into evidence, and there was no proof or even reasonable suggestion of tampering with or material change in the weapon; however, it would have been the better practice for the State to establish a chain of custody and offer testimony that no substantial change in the weapon had occurred.

2. **Criminal Law § 45— experimental evidence — admissibility — review on appeal**

    Although experimental evidence should be received with great care, it is admissible when the trial judge finds it to be relevant and of probative value; even upon such finding the admission of experimental evidence is always subject to the further restriction that the circumstances of the experiment must be *substantially* similar to those of the occurrence before the court, and whether substantial similarity does exist is a question which is reviewable by the appellate courts in the same manner as is any other question of law.

3. **Criminal Law § 45— experimental evidence — similarity of conditions**

    The trial court in a second degree murder case did not err in allowing evidence of certain experiments conducted with the murder weapon since the circumstances of the experiments were substantially similar to those surrounding the crime though the pistol contained only one bullet when the experiments were made as compared with the fact that the weapon had bullets in each chamber when the shooting occurred, and there was no specific showing as to the similarities or dissimilarities between the floor on which the experiments were conducted and the floor in defendant's bathroom where the crime occurred.

4. **Homicide § 5— second degree murder — intentional assault with deadly weapon**

    If the State satisfies the jury beyond a reasonable doubt or it is admitted that a defendant intentionally assaulted another with a deadly weapon, thereby proximately causing his death, two presumptions arise: (1) that the killing was unlawful and (2) that it was done with malice, and nothing else appearing, the person who perpetrated such assault would be guilty of murder in the second degree.

State v. Jones

5. **Homicide § 21— intentional assault with deadly weapon — sufficiency of evidence**

The trial court in this second degree murder prosecution did not err in denying defendant's motion for nonsuit where the evidence was uncontroverted that decedent met her death from a wound proximately caused by a pistol, and the State's evidence concerning the course of the death bullet and experimental evidence concerning the firing of the death weapon left defendant's theory of accident or misadventure with no substantial basis in fact.

6. **Homicide § 30— submission of lesser included offense — no prejudice**

Submission of the offense of involuntary manslaughter to the jury in a second degree murder prosecution was not prejudicial to defendant.

ON *certiorari* to review the decision of the Court of Appeals, 23 N.C. App. 162, 208 S.E. 2d 419, which found no error in the trial before *Crissman, J.,* April, 1974, Criminal Session of CABARRUS Superior Court.

Defendant. was tried upon an indictment, proper in form, charging him with the murder of his wife, Carolyn Lawing Jones. Upon the call of the case, the solicitor elected to try defendant for second-degree murder or any lesser included offense that the jury might find. Defendant entered a plea of not guilty.

The evidence for the State tended to show the following facts:

Dr. Charles F. Carroll, Jr., District Pathologist and Medical Examiner for Cabarrus County, stipulated to be an expert in the field of pathology, testified that on 17 July 1971 he examined the body of Carolyn Lawing Jones in the morgue at the Cabarrus Memorial Hospital. During his examination he observed a perforating bullet wound in her right chest. From his examination, he concluded that the bullet entered the right chest near the vetebrae, thirteen and one half inches from the top of the head and one and one half inches to the right of the midline. The bullet exited in the back of the right chest sixteen and one half inches from the top of the head and three quarters of an inch to the right of the midline. In other words, the exit wound in the back of the body was about three inches below the entrance wound in the front of the body. In his opinion decedent's death was directly and proximately caused by the bullet wound. On cross-examination, he testified that he could not determine the position of decedent's body when the bullet entered. He

stated that the trajectory of the bullet through the body was with reference to the top of the head and that the path which the bullet took through the body would depend on the position of the torso at the time of the wound.

C. D. Eggers, a member of the Cabarrus County Sheriff's Department, testified that on 17 July 1971 he went to the combination restaurant and home of defendant. He observed a bullet lying on the floor in the center of the bathroom. He also identified a .32 caliber Colt pistol which he first saw lying on the table in the den. Defendant told the witness that the pistol belonged to him and was the weapon which caused his wife's death.

Glenn Mauer, stipulated to be an expert in the field of firearms identification and ballistics, testified that he received a Colt .32 AP caliber pocket model automatic loading pistol and a spent bullet from Officer Eggers on 3 August 1971. The bullet had been found in the bathroom of defendant's home. He conducted firearms identification tests with regard to the pistol and bullet and determined that the bullet was fired from this pistol. Over objection, he was allowed to testify as to experiments which he performed with the pistol to determine under what conditions it would fire when dropped. The evidence with regard to the experimental evidence is more fully set forth in the opinion.

Lewis Crooks of the Cabarrus County Sheriff's Office testified that on 17 July 1971 he received a telephone call at the Sheriff's Office from a person who identified himself as defendant. He recognized defendant's voice because he had known defendant for twelve or fifteen years prior to that date. The caller asked him to come out to "my place" because "I've just shot Carol." The witness asked whether an ambulance was necessary, and the caller replied that the deceased was already dead. The witness immediately went to the Jones premises and found defendant and Officer Ronald Ward there. The witness went into the bathroom, where he found the body of the deceased in a sitting position on the commode. He took defendant into custody and carried him to the Cabarrus County Jail. On cross-examination the witness testified that he did not think defendant told him during the telephone call that the shooting was an accident, but he recalled that defendant did so inform him at the scene. A mark appeared on the wall above the commode in photographs which were made on the night of the occurrence. He had no opinion as to what caused those marks.

Carroll Eggers, recalled, testified that he observed a gun wound on the body of deceased in the emergency room of the Cabarrus County Hospital on the morning after the shooting. He also testified that he picked the bullet up from the floor in the bathroom.

The State rested, and defendant moved for judgment as of nonsuit. The motion was denied.

Defendant presented evidence which tended to show the following facts:

Defendant testified that at about 11:30 p.m. on 17 July 1971 he and his wife were sitting in the dining room of the living quarters of their premises when he got up to use the bathroom. He asked her to call him if a customer came up to the gas pumps while he was in the bathroom. He was carrying a pistol in his pocket at the time because he had had some trouble on his premises, notably a couple of attempted robberies. He took the gun from his pocket as he started to take his belt loose so that the gun would not fall into the commode and placed it on the right-hand side of the commode. As he prepared to get off the commode, his wife came in and told him not to flush it because she had to use it. He pulled up his clothes, picked up the gun, and passed his wife as she entered the bathroom and prepared to sit on the commode. As he started to leave the bathroom, his wife began talking to him, and he turned to face her and continued fastening his clothes. He thought that at that point the gun was in his left hand. They had some further discussion, particularly related to selling the business in Cabarrus County and returning to Miami, Florida, where they had previously lived. When he finished fastening his clothes, he switched the pistol to his right hand, spun it over his finger, and was going to stick it into his pocket. As he executed this maneuver, the gun dropped from his hand and went off as he grabbed it, either "right at the floor or on the floor." Upon seeing blood on his wife's pajamas, he called for someone to call an ambulance. When he started to gather her up in order to take her to the hospital, she told him that she was dying. She died in his arms a moment or two later.

Defendant said that in 1962 he was convicted of assault on his wife, abandonment and nonsupport. On cross-examination defendant said that he had not had an argument with his wife that day and that he had consumed two beers on that day. He

did not know whether the gun fired when he grabbed it or when it hit the floor. The gun was a dual action, and it was not necessary to press both the safety and the trigger to cause it to fire. He then admitted that he was not sure about this latter statement.

Lewis Crooks, recalled as a witness for defendant, testified that defendant made a statement to him on the night of 17 July which substantially corroborated defendant's testimony.

Frank Edward Jones, the thirteen-year-old son of defendant and deceased, testified that he was awake when the fatal incident occurred and that he was standing in the hall outside the bathroom waiting to use the bathroom. His father was already in the bathroom, and he could see him through a crack in the door. His mother was sitting on the toilet. His father picked the gun up and started twirling it forward on his finger. The gun went off when it hit the floor. He later made a statement to the police out of the presence of his father.

William E. Pierce of the State Bureau of Investigation, stipulated to be an expert in the field of comparative chemistry, testified that he received a piece of yellow linoleum with a hole in it and a bullet from the Charlotte Crime Laboratory. He also received a small piece of tile and certain fragments. He found a very small yellow-and-white deposit on the back of the bullet. He concluded that the smear on the bullet was the same in appearance and elements of composition as the materials which composed the linoleum. On cross-examination he testified that the bullet "would have been skidding in some manner to have made that hole in the linoleum and gathered this stuff up." He had no opinion as to whether the bullet struck the linoleum.

Carroll Eggers, recalled, testified that on 18 July 1971 Frank Edward Jones told him that he saw his daddy pull a gun out of his pocket and start to twirl the gun; that the gun slipped out of his hand and fell on the floor; and that it discharged, hitting his mother. He further testified that as viewed from the photograph in evidence depicting the scene as the boy observed it, "there is no way to see anyone on the commode" from where the boy was standing.

Kenneth Crews, an attorney, testified that he went to the jail and talked with defendant. Several days later he went to the Jones premises and made photographs of a mark on the wall on

the right-hand and slightly above the lid of the commode. Defendant, who was present at the time, measured the distance from the seat of the commode to the mark as twenty-six inches.

Defendant rested and renewed his motion for judgment as of nonsuit. The motion was denied.

The jury returned a verdict of guilty of second-degree murder. Defendant appealed from judgment imposing a prison sentence of not less than twenty-five nor more than thirty years.

*Attorney General Rufus L. Edmisten, by Assistant Attorney General T. Buie Costen and Associate Attorney Thomas M. Ringer, Jr., for the State.*

*Clarence E. Horton, Jr., for the appellant.*

BRANCH, Justice.

Defendant assigns as error the trial court's denial of his motion to suppress evidence of certain experiments conducted with the pistol which inflicted the fatal wound. His objection was predicated upon the grounds (1) that the experiments were not performed under conditions substantially similar to the conditions prevailing at the time of the fatal incident and (2) that there was no evidence to indicate that the weapon was in substantially the same condition at the time of the experiments as it was at the time of the shooting.

The evidence with regard to the experiments tends to show the following facts:

C. D. Eggers, a member of the Sheriff's Department of Cabarrus County, testified that he first saw the .32 caliber Colt pistol in question lying on the table in the den portion of defendant's premises on the night of the alleged murder. Defendant acknowledged to the officer that the gun was his and that it was the weapon which had shot his wife. Eggers produced a photograph which showed the gun lying on the table in the den.

Glenn Mauer, a firearms identification specialist stipulated to be an expert in the field of firearms identification and ballistics, testified that Officer Eggers delivered the weapon to him in Richmond, Virginia, on 3 August 1971, some 17 days after the alleged murder. On 5 August, Mauer conducted the tests in question. On cross-examination, Mauer stated that he was unable

to say whether the gun was in substantially the same condition on 3 August as on 17 July. After testifying that the pistol had both a thumb-level safety and a grip safety, he testified that he dropped the gun from heights of six inches, twelve inches, and up through forty-two inches, respectively, onto the wooden floor approximately one half to three quarters of an inch thick. The pistol would not fire. The witness stated that he did not know the kind of surface upon which the gun had dropped at the time of the shooting. After conducting these initial tests, he then placed tape around the grip safety of the firearm so as to make the safety ineffective and observed that it did not fire when dropped from a distance of twelve inches, but that it did fire when dropped from a height of eighteen inches. At the time he dropped the gun onto the wooden surface, there was only one bullet in the pistol, and he conceded that the gun might have been somewhat heavier if it had been fully loaded.

Mr. Eggers, recalled, testified that an Officer Ward, who at the time of the trial was an unavailable witness, delivered the pistol to him at the time of the fatal occurrence and that he did not, at that time, perform any tests on the bullet or the gun.

One of the best statements by this Court on the question of admissibility of experimental evidence is found in *State v. Phillips*, 228 N.C. 595, 46 S.E. 2d 720. In that case, the prosecution, over the defendant's objection, introduced evidence of experiments with the death pistol, which was fired at close range to determine whether there would be resulting powder burns. This Court approved the trial judge's ruling admitting this evidence and, speaking through Chief Justice Stacy, stated:

> The competency of experimental evidence depends upon its trustworthiness to aid in the proper solution of the problem in hand. [Citations omitted.] When the experiment is carried out under substantially similar circumstances to those which surround the original transaction, and in such a manner as to shed light on that transaction, the results may be received in evidence, although such experiment may not have been performed under *precisely* similar conditions as attended the original occurrence. The want of exact similarity would not perforce exclude the evidence, but would go to its weight with the jury. [Citations omitted.] Whether the circumstances and conditions are sufficiently similar to render the results of the experiment com-

petent is of course a preliminary question for the court, and unless too wide of the mark, the ruling thereon will be upheld on appeal. [Citations omitted.]

"The general rule as to the admissibility of the result of experiments is, if the evidence would tend to enlighten the jury and to enable them to more intelligently consider the issues presented and arrive at the truth, it is admissible. The experiment should be under circumstances similar to those prevailing at the time of the occurrence involved in the controversy. They need not be identical, but a reasonable or substantial similarity is sufficient."—*Edwards, J.,* in *Shepherd v. State,* 51 Okla. Crim., 209, 300 P., 421.

True it is, unless the requirement of substantial similarity exist, or be duly observed, the experimental evidence should be rejected. [Citations omitted.] This is largely a matter to be decided in the light of all the attendant facts and circumstances. The measure of permissible variation in the conditions of the experiment from those of the occurrence is usually determined by whether such variation would tend to confuse or to mislead the jury. The object of every trial is to find the truth of the matter in controversy. If the experimental evidence contribute to this end, it is admissible; otherwise it should be excluded. [Citation omitted.]

*Accord: State v. Atwood,* 250 N.C. 141, 108 S.E. 2d 219.

In *State v. Holland,* 216 N.C. 610, 6 S.E. 2d 217, the defendant was charged with murder of his three-year-old stepson, whose body was found floating in a nearby millpond. The trial judge permitted a witness to testify, over defendant's objection, as to an experiment with two boards which were thrown in the pond to determine the drift of the stream while the mill was in operation. There was no motion to strike this testimony.

The Court, holding that the failure to move to strike was a waiver of the defendant's exception, nevertheless stated:

. . . Such experiments and evidence as to the result thereof are relevant. [Citations omitted.] "Whether or not evidence of experiments is admissible is, under the circumstances of each case, a preliminary question for the determination of the court in the exercise of its discretion, which will not be interfered with by an appellate tribunal unless an abuse is made clearly to appear. . . . " [Citations omitted.] If the

evidence became irrelevant upon the latter showing through the defendant that the mill was not in operation on the date of the alleged homicide, defendant's failure to move to strike was, in effect, a waiver of the exception.

The defendant was charged with secret assault and a battery with a deadly weapon in *State v. McLamb*, 203 N.C. 442, 166 S.E. 507. His defense was alibi. The prosecuting witness testified that he saw defendant when he appeared suddenly at night at a window of the prosecuting witness's home and shot him. The State offered other witnesses who testified, over objection, that, when sitting at the place where the prosecuting witness was sitting, they were able to identify people appearing at night outside under lighting conditions similar to those in effect on the night of the alleged crime. Defendant assigned as error the admission of this testimony. The Court overruled this assignment of error and stated:

Speaking to the subject, we find the following in 22 C.J., p. 755, sec. 842(1): "The conditions of a relevant occurrence may be artificially created in an experiment, and where the material facts bearing on the particular issue are precisely duplicated in the experiment, the result may be received in evidence. Such evidence is appropriate where the question to be determined relates to such matters as whether an object in a certain position can be seen from a given height above a designated spot, or from a given distance," etc. Section 843(3) at p. 756: "Whether or not evidence of experiments is admissible is, under the circumstances of each case, a preliminary question for the determination of the court, in the exercise of its discretion, which will not be interfered with by an appellate tribunal unless an abuse is made clearly to appear." [Citations omitted.]

In *State v. Hedgepeth*, 230 N.C. 33, 51 S.E. 2d 914, defendant was charged with assault on a child with intent to commit rape. At trial, he offered witnesses to the effect that the day before the trial "was a cloudy, drizzly day, the whole sky was overcast." Defendant's witnesses, had they been permitted to testify, would have said that they went to the home of the girl on that day and were unable to look through the window and distinguish any object in the room while standing at distances varying from one to ten feet from the window. Mrs. Bowden, the principal witness for the State, testified that on the day

of the alleged crime she looked into the room from the outside and saw defendant with the child in a position consistent with the commission of the crime. Defendant had elicited testimony that the day of the alleged crime was a hazy, cloudy, overcast day. Mrs. Bowden, however, testified that although a hurricane was approaching, the sky was clear on the day of the alleged crime. The trial judge excluded the testimony of the three witnesses, and this Court, holding this ruling to be error, stated:

> While the similarity of the circumstances and conditions is a preliminary question for the court, we are of the opinion that its ruling here was a bit "too wide of the mark." The only evidence of guilt is contained in the testimony of Mrs. Bowden. Whether she could see through the window is a material factor in determining the truth of her statements. The testimony developed through the experiments tends sharply to impeach her testimony and assail her credibility. Hence, its exclusion was prejudicial to defendant. . . .

A cursory reading of *State v. Foust*, 258 N.C. 453, 128 S.E. 2d 889, leaves the impression that it supports defendant's position. There, over defendant's objection, the trial court allowed a non-expert witness to testify that, according to his experiments with the death gun, the gun could not be fired unless the hammer was pulled completely back before the trigger was pulled. The defendant's defense was that he and deceased were playing, and the gun went off when she grabbed it near the end of the barrel. Reversing the trial judge's ruling, this Court stated:

> There is no other evidence in the record as to how the safety device on this gun operates. There is no evidence in the record as to whether the safety device on the gun was on or off when it fired and killed Sylvia, or as to whether at that time it was cocked or not. There is no evidence in the record that when Millikan made his experiments the gun was in substantially the same condition as on the day Sylvia was killed. Defendant's defense is that the shooting of the gun resulting in Sylvia's death was by accident or misadventure. In our opinion the experimental evidence given by Millikan should have been rejected, because it does not appear from the evidence before us that his experiments were carried out under substantially similar

circumstances to those which surrounded the firing of the gun when Sylvia was killed. [Citation omitted.]

*Foust* is factually distinguishable from the case before us for decision. In *Foust,* the witness was not an expert in ballistics or firearm identification. Here the witness was stipulated to be an expert in firearm identification and ballstics. In *Foust* there was no evidence as to whether the safety device on the gun was on or off at the time of the fatal shooting. Here the expert witness testified that the safety device always required pressure on the handle of the pistol before it would fire.

[1] The decision in *Foust* was based partially upon the fact that there was no evidence to show that the gun was in substantially the same condition at the time of the experiment as on the day of the shooting. Defendant also relies upon the same argument to sustain his position. The rule applied to the admission of real evidence furnishes some guidance to our decision of this question. This rule is well stated in E. Cleary (Gen. Ed.), McCormick's Handbook of the Law of Evidence § 212 (2d Ed.), as follows:

> . . . Objects offered as having played such a direct role, e.g., the alleged weapon in a murder prosecution, are commonly called "real" or "original" evidence and are to be distinguished from evidence which played no such part but is offered for illustrative or other purposes. It will be readily apparent that when real evidence is offered an adequate foundation for admission will require testimony first that the object offered is *the* [original emphasis] object which was involved in the incident, and *further that the condition of the object is substantially unchanged.* If the offered item possesses characteristics which are fairly unique and readily identifiable, and if the substance of which the item is composed is relatively impervious to change, the trial court is viewed as having broad discretion to admit merely on the basis of testimony that the item is the one in question and is in a substantially unchanged condition. On the other hand, if the offered evidence is of such a nature as not to be readily identifiable, or to be susceptible to alteration by tampering or contamination, sound exercise of the trial court's discretion may require a substantially more elaborate foundation. A foundation of the latter sort will commonly entail testimonially tracing the "chain of custody" of the

item with sufficient completeness to render it improbable that the original item has either been exchanged with another or been contaminated or tampered with. [Emphasis supplied; footnotes omitted.]

The failure of the State to show lack of substantial change in the weapon does not rise to the level of prejudicial error in light of the fact that defendant offered no objection to the admission of the pistol into evidence and particularly so since there is no proof or even reasonable suggestion of tampering with or material change in the weapon. We note, however, that it would have been the better practice for the State to establish a chain of custody and offer testimony that no substantial change in the weapon had occurred.

At this point we think it helpful to review briefly a few cases from other jurisdictions which are factually quite similar to instant case.

In *Mansfield v. Commonwealth,* 163 Ky. 488, 174 S.W. 16, the court approved the trial judge's ruling which permitted a witness to testify that a hammerless .38 Smith and Wesson pistol could not be discharged unless the safety device was pressed and the trigger pulled simultaneously. In that case, the actual death weapon was unavailable, and the testimony proffered was supported by other evidence that all Smith and Wesson hammerless pistols were of the same type and mechanism. The court's holding was not supported by reasoning which merits repetition.

The defendant was charged with murder in *State v. Ernst,* 150 Me. 449, 114 A. 2d 369. There the evidence revealed that defendant was seeking to apprehend the deceased, whom he had discovered in the process of stealing eggs, when the defendant's shotgun went off, fatally wounding the decedent. The defendant contended that the deceased grabbed the gun and started to pull it out of his hand and that this action caused the gun to discharge without fault of the defendant. Attempting to counteract this contention, the State produced as a witness a captain in the Maine State Police to whose qualifications as an expert defendant interposed no objection. This witness testified that he conducted certain tests to determine whether or not there was any mechanical failure in the operation of the gun. The tests, *inter alia,* consisted of dropping the gun from a distance of about thirty inches onto the floor by the butt and then

throwing the gun on its side several times at a distance of thirty inches to ascertain whether it would fire. The defendant objected to the admission of this evidence in the absence of a showing of a similarity of circumstances between the experiment and the occurrence itself. The court did not actually address itself to the question of similarity of conditions but merely stated that, in view of the position taken by the defendant, it was relevant for the State to introduce evidence as to the firing capacity of the gun.

In *Hodge v. State,* 60 Tex. Crim. 157, 131 S.W. 577, the defendant contended that the fatal shot was fired when his .38 caliber Smith and Wesson pistol struck the floor while in its holster. The State presented evidence which tended to show that, because the pistol was equipped with a safety notch upon which the hammer rested, it could not be fired by being struck a blow, and by inference could not have discharged when the hammer struck the floor. To meet this evidence, the defendant sought to introduce evidence to the effect that an experiment had been made with the pistol by fastening it in a secure place and striking the pistol hammer, while it rested on the safety notch, a slight blow with a hammer, which blow caused the pistol hammer to strike and explode the cartridge. The court excluded the testimony on the grounds that the experiment was not done in the same way the appellant claimed that the shot was fired, *i.e.,* by striking the floor. The appellate court held that the exclusion of this evidence was prejudicial to defendant and stated that if defendant could show "in any legitimate way that, although the hammer was on a safety notch, it could be made to explode a cartridge, he certainly would have a right to meet the state's case."

We find an excellent discussion concerning the similarity of conditions requisite for the admission of experimental evidence in *Love v. State,* 457 P. 2d 622 (Alaska). We quote from that case:

> As with other forms of circumstantial evidence, the trial judge may, in his discretion, exclude the experimental evidence after a determination that the probative value of the experimental evidence is outweighed by the possibility of prejudice, confusion of the issues or undue consumption of time. This discretion is, however, dependent upon a showing of substantial similarity of conditions by the proponent of the evidence.

State v. Jones

As the court observed in *Tuite v. Union Pac. Stages, Inc.*, 204 Or. 565, 284 P. 2d 333 (1955), quoting from *Leonard v. Southern Pac. Co.*, 21 Or. 555, 28 P. 887 (1892):

"The principle is that at best it is within the discretion of the court to admit any testimony whatever about experiments or similar occurrences. But in any event the conditions must appear to be substantially the same. It is not within the discretion of the court to admit evidence about experiments, unless the conditions are substantially alike." 284 P. 2d, at 345.

Another statement of this rule is found in *Ft. Worth & Denver Ry. v. Williams*, 375 S.W. 2d 279 (Tex. 1964):

"Before it can be said that dissimilarity of conditions merely goes to the weight and hence presents a jury question, the judge must be able to say with some degree of certainty, that confusion will not occur and such dissimilarities as are disclosed are capable of explanation so as to be readily understood." 375 S.W. 2d, at 282.

In other words, if the differences of condition can be explained, so that the effect of those differences upon the experiment can be evaluated rationally, the judge may exercise his discretion and admit the evidence, for it can be helpful to the jury. But the judge cannot use his discretion to decide that despite a plain lack of substantial similarity in conditions he will, nevertheless, admit the evidence. In cases concerning the admissibility of experimental evidence, the foundation for admissibility should be scrutinized closely to determine whether the conditions surrounding the experiment were substantially similar to those of the alleged occurrence.

In applying the test of substantial similarity, the trial court should be guided by the following principles: Are the dissimilarities likely to distort the results of the experiment to the degree that the evidence is not relevant? Can the dissimilarities be adjusted for or explained so that their effect on the results of the experiment can be understood by the jury? In this connection the court must consider the purpose of the experiment and the degree to which the matter under experiment is a subject of precise science.

Absolute certainty is not required if the experiment would be considered valid by persons skilled or knowledgeable in the field which the experiment concerns.

This determination of whether substantial differences exist may not always be capable of a mechanical solution, but the same may be said about most trial court evidentiary determinations that employ notions of relevance or materiality. Frequently common sense provides a good guide to whether a factor entering into an evidentiary determination is substantial or merely unimportant.

[2] The rule concerning admission of experimental evidence has become somewhat confused by statements in our cases to the effect that the admission of such evidence rests in the discretion of the trial judge. In this jurisdiction a necessary corollary to such statement is that the trial judge's ruling must stand unless the appellate court finds an abuse of discretion. However, such conclusion had been negated by statements in our cases that the trial judge's ruling will not be disturbed unless "it is too wide of the mark," *State v. Phillips, supra,* or if the evidence upon which the ruling was based was "irrelevant." *State v. Holland, supra.* In fact, this Court has reversed a trial judge's ruling on this question without any discussion of the trial judge's discretion. *State v. Hedgepeth, supra.* Our review of the relevant case law convinces us that the correct rule as to the admissibility of experimental evidence is as follows: Although experimental evidence should be received with great care, it is admissible when the trial judge finds it to be relevant and of probative value. Even upon such finding the admission of experimental evidence is always subject to the further restriction that the circumstances of the experiment must be *substantially* similar to those of the occurrence before the court. Whether substantial similarity does exist is a question which is reviewable by the appellate courts in the same manner as is any other question of law. *State v. Carter,* 282 N.C. 297, 192 S.E. 2d 279 ; *Love v. State, supra.*

[3] Here, the experimental evidence tended to enlighten the jurors in their search for a true verdict. There remains the question of whether the experiment was conducted under conditions substantially similar to those existing at the time of the fatal shooting. The principal dissimilarities upon which defendant relies are (1) the pistol contained only one bullet when the experiments were made as compared with the fact that the

State v. Jones

weapon had bullets in each chamber when the shooting occurred and (2) there was no specific showing as to the similarities or dissimilarities between the floor on which the experiments were conducted and the floor in defendant's bathroom.

Precise reproduction of circumstances is not required, and the effect of the differences which existed was explainable by the State's expert witness. Even though such explanation was apparently not called for upon direct examination or cross-examination, we do not perceive that the differences complained of distorted the experiments to the extent that the evidence became irrelevant. In our opinion the trial judge was not "too wide of the mark" in determining that the circumstances of the experiment were substantially similar to those surrounding the alleged homicide.

Conceding *arguendo* that the circumstances of the experiment did not meet the requirement of substantial similarity, defendant has failed to show prejudice because of the admission of the experimental evidence. Analysis of the effect of the experimental evidence reveals (1) that the fact that the gun fired at all during the experiments was favorable to defendant and supported his contention of accident or misadventure and (2) that the only possible prejudice to defendant resulting from the experimental evidence was that the pistol would not fire unless the safety on the handle of the weapon was depressed.

Prior to the offering of the experimental evidence, the expert witness, Glenn Mauer, testified *without objection* that State's Exhibit 5 (the death weapon) was an automatic loading pistol, and, in order to fire it, "one must depress the grip safety and apply pressure to the trigger. If pressure is applied to the trigger and the grip safety is not depressed then the firearm will not fire." It is a well-recognized rule in this jurisdiction that the admission of testimony over objection is ordinarily harmless error when testimony of the same import had previously been admitted without objection or is thereafter introduced without objection. *State v. Winford*, 279 N.C. 58, 181 S.E. 2d 423; *State v. Gaskill*, 256 N.C. 652, 124 S.E. 2d 873. Although the challenged evidence was a different *type* of evidence, its import was the same as that previously admitted without objection. The expert witness's unequivocal statement contained the same possibilities of damage to defendant's position as did the challenged experimental evidence.

We hold that the trial judge correctly admitted the experimental evidence.

Defendant next assigns as error the failure of the trial judge to grant his motion for judgment as of nonsuit on the charge of murder in the second degree.

[4]   Murder in the second degree is the unlawful killing of a human being with malice but without premeditation and deliberation. *State v. Winford, supra; State v. Jennings,* 276 N.C. 157, 171 S.E. 2d 447; *State v. Foust, supra.* If the State satisfies the jury beyond a reasonable doubt or if it is admitted that a defendant intentionally assaulted another with a deadly weapon, thereby proximately causing his death, two presumptions arise: (1) that the killing was unlawful and (2) that it was done with malice. Nothing else appearing, the person who perpetrated such assault would be guilty of murder in the second degree. *State v. Winford, supra; State v. Mercer,* 275 N.C. 108, 165 S.E. 2d 328; *State v. Propst,* 274 N.C. 62, 161 S.E. 2d 560; *State v. Gordon,* 241 N.C. 356, 85 S.E. 2d 322. In the case *sub judice,* defendant's contention is that an accidental discharge of the deadly weapon caused the death of his wife. If, in fact, defendant unintentionally proximately caused his wife's death by the use of the pistol, in a manner which was not reckless or wanton, with no wrongful purpose, and while engaged in a lawful pursuit, the homicide would be excused on the ground of accident or misadventure. *State v. Phillips,* 264 N.C. 508, 142 S.E. 2d 337; *State v. Faust,* 254 N.C. 101, 118 S.E. 2d 769; 40 Am. Jur. 2d *Homicide* § 112, at 406. Defendant's contention that the homicide resulted from accident or misadventure was a denial that he committed the crime charged, and such contention was not an affirmative defense which resulted in the imposition of any burden of proof upon him. The burden remained upon the State to prove each and every element of the crime charged beyond a reasonable doubt. *State v. Woods,* 278 N.C. 210, 179 S.E. 2d 358; *State v. Moore,* 275 N.C. 198, 166 S.E. 2d 652; *State v. Fowler,* 268 N.C. 430, 150 S.E. 2d 731; *State v. Phillips,* 264 N.C. 508, 142 S.E. 2d 337; *State v. Williams,* 235 N.C. 752, 71 S.E. 2d 138.

[5]   Here, it is uncontroverted that decedent met her death from a wound proximately caused by the pistol (State's Exhibit 5). However, the other elements of second-degree murder—malice and an unlawful killing—are not so easily met. There was no

evidence that the killing was unlawful and done with malice unless these elements of second-degree murder were supplied by the presumption arising from an *intentional* assault with a deadly weapon. Defendant's evidence was to the effect that the firing of the pistol was accidental. The State relies upon circumstantial evidence and contends that the downward course of the bullet as it passed through the body of deceased was contrary to natural laws and scientific principles, thereby directly refuting defendant's evidence that he accidentally dropped the pistol, which fired as it hit the floor or as he "grabbed it" just as the pistol struck the floor. The State argues that the course of the death bullet and the experimental evidence concerning the firing of the death weapon left the theory of accident or misadventure with no substantial factual basis.

In considering defendant's motion for judgment as of nonsuit, the trial judge must consider the evidence in the light most favorable to the State, take it as true, and give the State the benefit of every reasonable inference to be drawn therefrom. If there is evidence, direct, circumstantial, or a combination of both, from which the jury can find that the offense charged was committed by the defendant, the motion for judgment as of nonsuit must be overruled. *State v. Goines,* 273 N.C. 509, 160 S.E. 2d 469; *State v. Cutler,* 271 N.C. 379, 156 S.E. 2d 679; *State v. Overman,* 269 N.C. 453, 153 S.E. 2d 44. When so considered, the State's evidence in instant case was sufficient to support a reasonable inference and a jury finding that defendant intentionally assaulted his wife with a deadly weapon, thereby proximately causing her death.

We hold that the trial judge correctly denied defendant's motion for judgment as of nonsuit on the charge of murder in the second degree.

[6] Finally, we agree with defendant's contention that the evidence did not require the submission of the lesser included offense of voluntary manslaughter; however, its submission to the jury was prejudicial to the State, not to defendant. *State v. Accor* and *State v. Moore,* 281 N.C. 287, 188 S.E. 2d 332; *State v. Rogers,* 273 N.C. 208, 159 S.E. 2d 525; *State v. Chase,* 231 N.C. 589, 58 S.E. 2d 364. Even had there been prejudice in the submission of voluntary manslaughter to the jury, such prejudice was cured by the fact that the jury never reached the consideration of this lesser included offense.

We have carefully examined every assignment of error as well as this entire record and find no error warranting a new trial.

The decision of the Court of Appeals is

Affirmed.