IN THE COURT OF APPEALS OF NORTH CAROLINA

No. COA19-897

Filed: 6 October 2020

Person County, Nos. 15 CRS 51597, 1191

STATE OF NORTH CAROLINA

v.

JOHN BRONA TURNER III

Appeal by defendant from judgment entered 9 November 2018 by Judge Carl R. Fox in Person County Superior Court. Heard in the Court of Appeals 12 August 2020.

> *Attorney General Joshua H. Stein, by Special Deputy Attorney General Thomas O. Lawton III, for the State.*

> *Glover & Petersen, P.A., by James R. Glover, for defendant.*

DIETZ, Judge.

John Turner appeals his conviction for first degree murder. He contends that the trial court wrongly admitted expert testimony about an experiment the State conducted using the gun from the crime scene.

Admission of expert testimony is governed by Rule 702 of our State's Rules of Evidence. But Turner never cites Rule 702 or any of its accompanying case law in this appeal.

Instead, Turner contends that there is a separate, stand-alone rule for the

admissibility of the particular type of expert testimony at issue in this appeal, which is sometimes called "experimental evidence." Here, for example, law enforcement recovered shell casings in various locations at the scene of the crime. The State's forensic firearms expert conducted an experiment by firing the gun used in the crime at various angles and measuring the direction and distance that the shell casings traveled. The expert presented the results of that experiment to the jury so that the jury could use the information to infer the location of the shooter.

Citing cases from the 1960s and 1970s (before the Rules of Evidence existed), Turner argues that this Court must conduct a *de novo* review of the admissibility of this experimental evidence by applying a special "substantial similarity" test. We reject this argument. The concept of substantial similarity is now part of the reliability analysis that the trial court conducts under Rule 702. This Court reviews that analysis for abuse of discretion. As explained below, applying Rule 702 and its accompanying case law, the trial court was well within its sound discretion to admit this expert testimony. We therefore find no error in the trial court's judgment.

**Facts and Procedural History**

In August 2015, John Turner called 911 and reported that he had shot his neighbor, Nicholas Parker. When the operator asked if Parker was still alive, Turner said that Parker was moving and trying to breathe. Turner asked what to do with the gun and the operator instructed him to secure it.

Police arrived on the scene and found Parker's body lying face down in a pool of blood at the end of a driveway. Turner was standing nearby, still holding a gun. Parker had multiple bullet wounds and no pulse. He was pronounced dead at the scene.

Police recovered eight shell casings, in a generally linear formation, at different distances from Parker's body. Law enforcement arrested Turner and he waived his *Miranda* rights and gave a videotaped statement about the shooting. The State ultimately charged Turner with first degree murder and possession of a firearm by a felon.

The case went to trial. Testimony from neighbors and family members established that Turner and Parker did not get along and had heated disputes over many issues including a shared property line.

Turner testified that the month of the shooting, a stray dog showed up in the neighborhood and was causing problems. A neighbor asked Turner to help with the dog and Turner tried to get the dog under control but was unsuccessful. One night later that month, Turner heard gunshots coming from Parker's property and then saw the stray dog limping away.

Turner believed that Parker had shot the dog. He went into his house, retrieved his semi-automatic pistol, and went looking for the wounded dog. As Turner walked down the road, he and Parker saw each other. Turner continued walking and,

after chambering a round in his gun, found the dog and determined it was dead.

At that point, according to Turner, Parker started "hollering" at him. Turner responded and "everything went south from there." Turner testified that Parker was "in a rage" and shouted that he had shot the dog and would shoot Turner too, that he had been "waiting for this," and that they would "get this over with."

Turner testified that he then saw Parker make a move toward his waist. Turner responded by shooting Parker. Turner admitted that he did not see Parker grab a weapon but assumed Parker had a gun in his waistband because he knew Parker had just shot the dog. Turner testified that he was stumbling backward while shooting Parker and estimated that he shot at Parker for "less than five seconds."

The medical examiner testified that Parker was shot 11 or 12 times, with the bullets traveling through a number of his vital organs, including his lungs and heart. All but two of the entrance wounds were in Parker's back and side.

Kelby Glass, a certified forensic firearms examiner with the Cumberland County Sheriff's Department, testified as an expert witness for the State over Turner's objection. The trial court accepted Glass as an expert in "forensic firearms examination" and qualified him to give expert opinion testimony "in the area of forensic firearms testing for ejection, this is for ejection and distance purposes in this case." Glass then testified about the results of an experiment he conducted to determine the direction and average distances shell casings traveled after being

ejected from Turner's gun. That experiment showed that when the gun was fired while parallel to the ground, the shell casings traveled backward and to the right roughly eight to nine feet. When the gun was fired at 45-degree and 60-degree angles to the ground, the casings instead traveled a few feet forward and nine to eleven feet to the right.

Glass did not offer an opinion about Turner's location at the time of the shooting; he merely described the results of the experiment. But having heard this testimony, the jury could examine the location of the shell casings following the shooting and make inferences about Turner's location and the angle of the gun during the shooting.

In closing arguments, Turner's counsel argued that he should be found not guilty based on self-defense and that, at most, he should only have been charged with voluntary manslaughter. The State argued that, based on the physical evidence including the number of entrance wounds in Parker's back and side, the location of Parker's body, and the location of the shell casings, Turner did not fall down and was not backing away during the confrontation, but instead was moving toward the unarmed victim, indicating malice and premeditation. The trial court instructed the jury on first degree murder, second degree murder, voluntary manslaughter, and self-defense.

The jury returned a guilty verdict for first degree murder and possession of a

firearm by a felon. The trial court consolidated the charges for judgment and sentenced Turner to life in prison without parole. Turner appealed.

## Analysis

Turner argues that the trial court erred by admitting the testimony of the State's forensic firearms expert, Kelby Glass. Turner challenges that expert testimony on two grounds. First, he contends that the experiment conducted by Glass was inadmissible as a matter of law because the conditions during the experiment were not substantially similar to the conditions at the time of the shooting. Second, he argues that Glass was not qualified to testify as an expert in the field of shell casing ejection patterns. We address these arguments in turn below.

### I. Use of a stand-alone "substantial similarity" test

Turner first challenges the shell casing ejection pattern experiment, which Glass used to help explain what happened on the night of the crime. Turner contends that the circumstances of Glass's experiment "were not substantially similar to the circumstances at the time of the shooting" because in "some instances, the circumstances were different" and in "other instances, circumstances that would affect the shell casing ejection pattern were not accounted for during the experiment."

At this point in our analysis, we typically would recite the applicable standard of review for this argument. But that standard of review is the heart of the legal dispute in this appeal, so that is not so simple here.

The admissibility of expert testimony in this case is governed by the North Carolina Rules of Evidence and, specifically, by Rule 702. The Rules of Evidence are statutes, enacted by our General Assembly, and the applicable portions of Rule 702 became law in 2011 as part of an amendment conforming Rule 702 with its federal counterpart. 2011 N.C. Sess. Laws 283, § 1.3 (eff. Oct. 1, 2011).

There are a number of appellate decisions interpreting the current version of Rule 702, most notably our Supreme Court's decision in *State v. McGrady*, 368 N.C. 880, 787 S.E.2d 1 (2016). In *McGrady*, the Court provided an outline of how to apply Rule 702 to proposed expert testimony. The Court also reaffirmed that a trial court's ruling on the admissibility of expert testimony under Rule 702 "will not be reversed on appeal absent a showing of abuse of discretion." *Id.* at 893, 787 S.E.2d at 11.

Turner's appellate brief does not cite Rule 702. Nor does it cite *McGrady* or any other case interpreting the current version of Rule 702. Instead, Turner relies on a handful of Supreme Court cases from the 1960s and early 1970s that not only predate the 2011 amendments to the Rules of Evidence, but also predate even the initial version of the rules, enacted in the early 1980s. *See* 1983 N.C. Sess. Laws, ch. 701, § 1; N.C. Gen. Stat. § 8C-1 (1983) (amended 2011).

At oral argument, Turner candidly acknowledged why he ignored Rule 702 and focused on these older cases—they differ from Rule 702 and cases interpreting the rule, such as *McGrady*, in a way that is favorable to Turner. Specifically, in 1975, our

Supreme Court in *State v. Jones* discussed the admissibility of "experimental evidence," meaning expert testimony about an experiment that is used to prove something about the actual events that occurred in the case. 287 N.C. 84, 214 S.E.2d 24 (1975). In *Jones*, the Supreme Court held that that, in addition to ordinary admissibility requirements of relevancy and probative value, experimental evidence "is always subject to the further restriction that the circumstances of the experiment must be substantially similar to those of the occurrence before the court." *Id.* at 98, 214 S.E.2d at 34. And, most important to Turner's argument, the Court also held that "[w]hether substantial similarity does exist is a question which is reviewable by the appellate courts in the same manner as is any other question of law." *Id.*

Relying on this precedent, Turner argues that the admissibility of experimental evidence must satisfy a stand-alone "substantial similarity" test, in addition to any admissibility requirements in Rule 702. Turner also contends that, unlike a Rule 702 analysis, this substantial similarity analysis is subject to *de novo* review on appeal, with the appellate court freely substituting its own judgment for that of the trial court.

We reject this argument for several reasons. First, even if we agreed with Turner that experimental evidence is subject to a special test separate from the ordinary Rule 702 analysis, later Supreme Court precedent holds that this test is a flexible one and subject to appellate review for abuse of discretion. For example, in

2000, the Supreme Court held that "[e]xperimental evidence is competent and admissible if the experiment is carried out under substantially similar circumstances to those which surrounded the original occurrence." *State v. Golphin*, 352 N.C. 364, 433, 533 S.E.2d 168, 215 (2000). But the Court also held that "exclusion is not required when the conditions are not exactly similar; rather, it goes to the weight of the evidence with the jury" and that "the trial court is given broad discretion to determine if the conditions are sufficiently similar." *Id.* at 434, 533 S.E.2d at 215.

Second, we do not agree that this test for "substantial similarity" persists as a separate, stand-alone test outside Rule 702, nor could it. Rule 702 uses a "three-pronged reliability test" that requires expert testimony to be based on sufficient facts or data; to be the product of reliable principles and methods; and to properly apply the principles and methods reliably to the facts of the case. *See* N.C. R. Evid. 702(a)(1)–(3).

In *McGrady*, the Supreme Court held that the "precise nature of the reliability inquiry will vary from case to case depending on the nature of the proposed testimony. In each case, the trial court has discretion in determining how to address the three prongs of the reliability test." 368 N.C. at 890, 787 S.E.2d at 9. The Court also provided "factors from a nonexhaustive list that can have a bearing on reliability" but emphasized that trial courts have "discretion to consider any of the particular factors articulated in previous cases, or other factors it may identify" to analyze Rule 702's

admissibility test. *Id.* at 890–92, 787 S.E.2d at 9–10.

The notion of "substantial similarity" for experimental evidence is one of the many "particular factors articulated in previous cases" that is now baked into the third prong of Rule 702's reliability test. Part of the process of applying otherwise reliable principles and methods from an experimental setting to the facts of the actual case is ensuring that the experimental setting and the actual one are sufficiently similar. Thus, as the Supreme Court explained in *McGrady*, because this pre-existing "substantial similarity" test has a bearing on the reliability evaluation, it is absorbed into the Rule 702 reliability test and becomes one of many factors the trial court will consider as part of the "flexible inquiry" into admissibility. *Id.* at 890–91, 787 S.E.2d at 9. This means that the older case law requiring *de novo* appellate review of substantial similarity is no longer good law—the question of substantial similarity is part of a Rule 702 analysis subject to review for abuse of discretion. *Id.* at 893, 787 S.E.2d at 11.

Turner does not argue on appeal that the trial court abused its discretion by admitting this evidence under Rule 702. Indeed, as noted above, Turner does not even cite Rule 702 or any of its accompanying case law in his brief. Ordinarily, this would mean any argument concerning admissibility under Rule 702 is abandoned. N.C. R. App. P. 28(b)(6). But even assuming this issue were properly presented for appellate review, we would readily conclude that the trial court's decision to admit this expert

testimony was within the court's sound discretion.

Before admitting the challenged testimony, the trial court conducted a lengthy *voir dire*. Turner questioned Glass extensively about possible differences between the conditions of the experiment and the conditions at the time of the shooting. For example, Glass acknowledged that, in the experiment, a trained law enforcement officer fired the gun while stationary and firmly holding the gun. Glass did not know if Turner held the gun in a similar manner or was moving while shooting. Similarly, Glass conducted the experiment on a grassy surface. Some of the shell casings at the crime scene were found in grass, but others were found on a gravel road.

Glass recognized these differences but did not view them as significant to the experiment. In his opinion, "the biggest variable in any of this would be the firearm. Some firearms, not all firearms, eject to the right and to the rear." Glass explained that the experiment was intended only to provide a "tentative estimate" of the shooter's location and the position of the firearm based on the expected trajectory of the shell casings from this particular firearm when held at various angles. The State explained that Glass's expert testimony was "very limited to how this gun operates when it's held in these positions" and that it was intended as "a demonstration as to how this particular gun operates," rather than "a scene re-creation."

At the conclusion of this *voir dire*, the trial court ruled that Glass may give expert testimony "in the area of forensic firearm ejection patterns, and for that very

limited purpose." Glass testified about the experiment consistent with his *voir dire* testimony.

As noted above, a trial court's assessment of reliability under Rule 702 "will not be reversed on appeal absent a showing of abuse of discretion." *McGrady*, 368 N.C. at 893, 787 S.E.2d at 11. "Under the abuse of discretion standard, our role is not to surmise whether we would have disagreed with the trial court, but instead to decide whether the trial court's ruling was so arbitrary it could not have been the result of a reasoned decision." *Id.* at 899, 787 S.E.2d at 15 (citations omitted). Here, the trial court's determination that the experiment met the Rule 702 criteria was a reasoned one and not manifestly arbitrary. Thus, we cannot hold that the trial court abused its discretion.

**II.  Qualification as an expert in shell casing ejection patterns**

Turner next argues that the trial court erred when it qualified Glass as an expert. The trial court accepted Glass as an expert "in the area of forensic firearms testing for ejection, this is for ejection and distance purposes in this case." Turner argues that Glass was not qualified to be an expert in this area because "Glass had no prior training and no prior experience in shell casing ejection pattern testing."

An expert witness must be "qualified as an expert by knowledge, skill, experience, training, or education." N.C. R. Evid. 702(a). "Whatever the source of the witness's knowledge, the question remains the same: Does the witness have enough

expertise to be in a better position than the trier of fact to have an opinion on the subject?" *McGrady*, 368 N.C. at 889, 787 S.E.2d at 9 (citation omitted). "In some cases, degrees or certifications may play a role in determining the witness's qualifications, depending on the content of the witness's testimony and the field of the witness's purported expertise. As is true with respect to other aspects of Rule 702(a), the trial court has the discretion to determine whether the witness is sufficiently qualified to testify in that field." *Id.* at 890, 787 S.E.2d at 9.

Here, Glass testified that he is a forensic firearms examiner with the Cumberland County Sheriff's Office and is certified in North Carolina Intermediate Law Enforcement. Before his law enforcement experience, Glass served in the military. He attended the National Firearms Examiner Academy, completing the course in 2017, and then became a "certified firearms examiner" through the Sheriff's Department laboratory and training program. Glass testified that "[i]n the last three years, as part of my normal duties testing firearms, I've fired over a thousand different firearms." Glass acknowledged that he had not taken any courses in the specific area of shell casing ejection pattern testing, and that there is no certification for that specific subject matter, but Glass stated that this type of testing "would fall under the purview" of what forensic firearms examiners like him would do "during the course of their duties."

To be sure, as Turner argues in his brief, Glass had not taken any courses or

training specifically on the topic of shell casing ejection patterns. Likewise, Glass had no prior experience conducting tests on the ejection patterns of shell casings. But "it is not necessary that an expert be experienced with the identical subject matter at issue or be a specialist" as long as "the expert witness because of his expertise is in a better position to have an opinion on the subject than is the trier of fact." *State v. Morgan*, 359 N.C. 131, 160, 604 S.E.2d 886, 904 (2004); *McGrady*, 368 N.C. at 889, 787 S.E.2d at 9.

Here, Glass was a certified forensic firearms examiner with extensive training in the operation of firearms. He had fired more than one thousand different firearms and was familiar both with the firearm used in this case and with the mechanics of firearms including their ejection of shell casings. The trial court was within its sound discretion to determine that Glass's specialized forensic firearms knowledge and understanding of the mechanics of firearms enabled him to reliably conduct this experiment and be in a better position than the jury to understand the ejection patterns of shell casings from the firearm at issue in this case. Accordingly, the trial court did not abuse its discretion by qualifying Glass as an expert "in the area of forensic firearms testing for ejection."

**Conclusion**

We find no error in the trial court's judgment.

NO ERROR.

Judges BERGER and ARROWOOD concur.